Daniel J. Kaiser [DK-9387]
KAISER SAURBORN & MAIR, P.C.
30 Broad Street, 37th Floor
New York, New York 10004
Telephone: (212) 338-9100
Facsimile: (212) 338-9088

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
RASVINDER DHALIWAL,

|  |  |
|---|---|
| Plaintiff, | **COMPLAINT** |
| -against- | 18-CV-         (      ) |
| MALLINCKRODT PLC a/k/a MALLINCKRODT PHARMACEUTICALS, an Irish public limited company, and MALLINCKRODT ENTERPRISES LLC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

-------------------------------------------------------------------x

Plaintiff Rasvinder Dhaliwal (hereinafter "Ms. Dhaliwal" or the "Plaintiff"), by her

attorneys Kaiser Saurborn & Mair, P.C., alleges as follows:

**NATURE OF THE CASE**

1.      This is a whistleblower retaliation case. In this action Ms. Dhaliwal seeks

damages and litigation costs, expert witness fees, attorneys' fees against Defendants

Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals and Mallinckrodt Enterprises, LLC

(Defendants collectively referred to as the "Defendants" or "Mallinckrodt" or the "Company")

for Defendants' retaliation, including retaliatory discharge of Ms. Dhaliwal from her position of

employment, pursuant to 15 U.S.C. § 78u-6(h) *et seq* and 31 U.S.C. § 3730(h).

1

2.      On **March 26, 2018**, Defendants terminated Ms. Dhaliwal's employment. This was the capstone to years of retaliation, harassment, threats and intimidation tactics she endured for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally and subsequently, reporting what she reasonably believed to be securities law violations, including violations of Rule 21F-17 pursuant to the Securities and Exchange Act of 1934, as amended, investor fraud, violations of the False Claims Act ("FCA") and Anti-Kickback Statute ("AKS"), among other violations of law to the Securities and Exchange Commission ("SEC"), Department Of Justice ("DOJ") and other governmental agencies.

3.      Ms. Dhaliwal now brings this action under the Securities Whistleblower Incentives and Protection provisions of Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h) *et seq.*, (the "Dodd-Frank Act") for Defendants' unlawful retaliation.

4.      Ms. Dhaliwal also brings this action pursuant to the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h) for Defendants' unlawful retaliation.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, based on Plaintiff's claims asserted herein arise under Section 922 of the Dodd-Frank Act.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims asserted herein arise under the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h).

7.     Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in the Southern District of New York.

## PARTIES

8.     Ms. Dhaliwal is a citizen of New York, New York.

9.     Ms. Dhaliwal began working for Questcor Pharmaceuticals, Inc. ("Questcor") as an Associate Director, Market Access on **August 1, 2014**.

10.     On **August 14, 2014**, Mallinckrodt plc acquired Questcor. With the acquisition, Questcor became a wholly owned subsidiary of Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals, at which time Ms. Dhaliwal became an employee of Mallinckrodt Pharmaceuticals.

11.     Following the **August 14, 2014** acquisition of Questcor by Mallinckrodt plc through the Defendants retaliatory discharge of Ms. Dhaliwal from her position of employment on **March 26, 2018**, her business cards, as well as her signature line included in her work emails and other documents continued to represent her employer as Mallinckrodt Pharmaceuticals.

12.      On **December 10, 2014**, Ms. Dhaliwal received an email from Mallinckrodt Communications, which stated, in pertinent part:

> "As part of the next phase of the integration process, on **December 29 [2014],** you will transfer to the **Mallinckrodt Pharmaceuticals payroll system** and as of January 1, you will begin using Workday, the Human Resource Information System (HRIS), for employee and manager self-service and pay slip information." Emphasis added, bolded original.

13.     The Mallinckrodt Pharmaceuticals payroll system provided payroll services to employees of Mallinckrodt Pharmaceuticals, such as Ms. Dhaliwal, through Mallinckrodt

Enterprises, LLC, a subsidiary of Mallinckrodt plc. While Ms. Dhaliwal's pay statements referred to the company as Mallinckrodt Enterprises, LLC, said statements accessed through normal channels also referenced Mallinckrodt Pharmaceuticals.

14.     An email dated **June 22, 2015** was sent by Mallinckrodt Communications to a Company distribution list, #ALL MKG Global, which stated, in pertinent part:

> Subject: Message From Matt Harbaugh: Financial Shared Services Center
>
> "the Finance organization is creating a Finance Shared Services Center (FSSC) bringing core financial functions together into a shared services organization… Functions within the FSSC will include Accounts Payable, Cash Applications, Contract Administration, Corporate Cards, Credit and Collections, Data Integrity, General Accounting, **Payroll**, Property Accounting, **Sales Incentive Compensation**, Travel and Entertainment and processing of Chargebacks, Rebates, Returns and Medicaid. **The FSSC will support all U.S. and Canada operations and continue to be responsible for some related activities in other regions.** Activities will transition over the coming months and **will be located in Mallinckrodt's existing offices at 325 McDonnell Boulevard**." Emphasis added, bolded original.

15.     Moreover, the reporting structure of Ms. Dhaliwal's supervisory management chain in **January 2017** reflected that of Mallinckrodt Pharmaceuticals. Said reporting structure was as follows: (i) Senior Director Corporate Accounts Market Access and Reimbursement, Vanessa Harris, RN ("Sr. Director Harris"); (ii) Vice President Global Market Access and Reimbursement, Todd Killian ("VP Killian"), until his separation from the Company, in or around **January 2017**; (iii) Executive Vice President and President Autoimmune and Rare Diseases Hugh O'Neill ("President ARD O'Neill"); and (iv) President, Chief Executive Officer and Director, Mark Trudeau ("CEO Trudeau").

16.     Further, subsequent to the Defendants **March 26, 2018** retaliatory discharge of Ms. Dhaliwal for her having repeatedly raised concerns about and objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental

agencies, she received a sham pay statement *via* postal mail on or about **April 3, 2018** that was mailed by Mallinckrodt Pharmaceuticals, which shared the same Hazelwood, Missouri address as Mallinckrodt Enterprises, LLC.

17.     Defendant Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals utilized Defendant Mallinckrodt Enterprises, LLC as part of its arsenal to commit unlawful acts and further, to disguise the perpetrator of its unlawful acts as a subordinate of the parent in an attempt to escape punishment and continue its wrongdoing.

18.     Defendant, MALLINCKRODT PLC a/k/a MALLINCKRODT PHARMACEUTICALS is an Irish public limited company headquartered in Staines-upon-Thames, Surrey, United Kingdom, with a Corporate Shared Services office in Hazelwood, Missouri and its Specialty Brands commercial headquarters in Bedminster, New Jersey.

19.     Defendant, Mallinckrodt Pharmaceuticals is a registered business name of Mallinckrodt plc with a U.S. Corporate office in Hazelwood, Missouri.

20.     Defendant, Mallinckrodt Pharmaceuticals is the Plan Sponsor for certain, if not all, group benefit plan(s) offered to Company employees.

21.     Defendant, Mallinckrodt plc continues to be subject to United States SEC reporting requirements and the applicable corporate governance rules of the New York Stock Exchange.

22.     Mark Trudeau is the President, Chief Executive Officer and Director of Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals.

23.     On **February 27, 2018**, pursuant to the requirements of the Securities and Exchange Act of 1934, Mark Trudeau in his capacity as President, Chief Executive Officer and

5

Director of Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals signed on behalf of the registrant Mallinckrodt public limited company the Form 10-K filed with the SEC.

24.     Mallinckrodt plc and its subsidiaries, is a global business that develops, manufactures, markets and distributes specialty pharmaceutical products and therapies and reported net sales of approximately $3,222,000,000 for fiscal year ended, **December 29, 2017.**

25.     Mallinckrodt plc reported H.P. Acthar® gel ("Acthar") net sales of approximately $1,195,000,000 for fiscal year ended, **December 29, 2017.**

26.     Defendant, MALLINCKRODT ENTERPRISES, LLC, a subsidiary of Mallinckrodt plc (together with Mallinckrodt plc and Mallinckrodt Pharmaceuticals "Mallinckrodt") is a Delaware limited liability company with its corporate office in Hazelwood, Missouri (Defendants collectively referred to as the "Defendants" or "Mallinckrodt" or the "Company").

27.     Mallinckrodt Enterprises, LLC is registered with the New York Department of State to do business in New York.

28.     According to a certain **March 2015** and **August 2015** Stock Purchase Agreement, each of which are filed with the SEC, Kathleen A. Schaefer is the President of Mallinckrodt Enterprises, LLC.

29.     In addition, Kathleen A. Schaefer is the Senior Vice President and Corporate Controller of Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals and further, is part of its Executive Team, as a Select Senior Leader.

30.     Moreover, pursuant to the requirements of the Securities and Exchange Act of 1934, Kathleen A. Schaefer in her capacity as Senior Vice President and Corporate Controller of

Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals signed on behalf of the registrant, Mallinckrodt public limited company the Form 10-K filed with the SEC on **February 27, 2018**.

31.     The Defendants share a common address, office space, and facilities.

32.     The Defendants share a common group of employees.

33.     The Defendants use one another's names interchangeably.

34.     Employees of each Defendant from time to time perform work for the benefit of one or more of the other Defendants.

35.     Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals and Mallinckrodt Enterprises, LLC together with its subsidiaries, affiliates and parent are part of a single group of companies that employed Ms. Dhaliwal. In the alternative, the Defendants were Ms. Dhaliwal's joint employers. Whether as a single group of companies or joint employers, the Defendants employed Ms. Dhaliwal within the meaning of the Dodd-Frank Act and the anti-retaliation provision of the FCA.

36.     Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals, jointly with the other Defendants, employed Ms. Dhaliwal within the meaning of the Dodd-Frank Act and the anti-retaliation provision of the FCA.

**GENERAL BACKGROUND**

37.     Ms. Dhaliwal officially began her employment with Questcor on **August 1, 2014**, as an Associate Director, Market Access reporting to Director, Market Access Mike Sweeting ("Director Sweeting").

38.     Ms. Dhaliwal's primary job responsibility entailed developing and maintaining relationships with commercial and government Payers located within the Northeast region – New

York, New Jersey, Connecticut, Rhode Island, Massachusetts, New Hampshire, Vermont and Maine – to ensure optimal access and favorable reimbursement coverage for Questcor's flagship specialty branded drug product, Acthar.

39.     Generally, the Payer accounts she covered provided insurance benefits to commercial, Medicare, and Medicaid lives, which collectively encompass the spectrum of private, state and federally funded healthcare programs.

40.     Acthar is an injectable drug approved by the U.S. Food and Drug Administration ("FDA") for the treatment of 19 different conditions, including Infantile Spasms ("IS"), exacerbations of Multiple Sclerosis ("MS") in adults, and certain difficult-to-treat autoimmune and inflammatory conditions.

41.     Ms. Dhaliwal also worked cross functionally with individuals from Medical Affairs, Sales, Marketing, Specialty and Trade, Analytics, Pricing and Contracting, Access Programs and other key departments to ensure product adoption and execution of the Company's overall strategic plan to exceed sales targets.

42.     No structured compliance or product training was provided to Ms. Dhaliwal during the first twelve weeks of her employment, though typically in the industry such training is not only provided to new employees, but generally the employees first three or so months is dedicated to a comprehensive training program.

43.     On **August 14, 2014**, within two short weeks of her employment, Mallinckrodt plc acquired Questcor in a cash and stock transaction valued at approximately $5.8 billion.

44.     With the acquisition, Questcor became a wholly owned subsidiary of Mallinckrodt plc a/k/a Mallinckrodt Pharmaceuticals, at which time Ms. Dhaliwal became an employee of Mallinckrodt Pharmaceuticals.

45.     Virtually, since the start of Ms. Dhaliwal's employment with Mallinckrodt, more specifically since an **August 28, 2014** meeting with Blue Cross Blue Shield of Rhode Island ("BCBS RI"), she raised concerns with respect to Questcor and Mallinckrodt's questionable business and compliance practices with her then immediate supervisor, Director Sweeting.

46.     In a very short amount of time Ms. Dhaliwal came to learn of other serious compliance concerns, as certain issues were directly told to her, while others she observed during her day to day activities while working at the Company.

47.     Ms. Dhaliwal repeatedly raised concerns about and objected to Defendants questionable business and compliance practices to not only her then immediate supervisor, Director Sweeting, but also to Director Sweeting's superiors and others in managerial positions within the Company.

48.     Despite all of Ms. Dhaliwal's efforts, the Defendant's questionable business and compliance practices, which Ms. Dhaliwal came to believe were improper and unlawful, continued un-remediated. On **November 21, 2014** and again on **January 26, 2015**, Ms. Dhaliwal expressed and further, raised her concerns to Mallinckrodt plc CEO Trudeau and then-Mallinckrodt plc Board Member (and former Questcor President & CEO), Don Bailey ("Board Member Bailey").

49.     On **November 26, 2014**, the Company's counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), in particular, John Bentivoglio ("Bentivoglio"), along with

Mallinckrodt's then-Senior Vice President & Chief Compliance Officer Raymond Furey ("CCO Furey") commenced a purported "independent" internal investigation of Ms. Dhaliwal's concerns, which concluded on **February 13, 2015**, predictably concluding that there had been no wrongful activity on the part of the Company.

50.     On **March 6, 2015**, Ms. Dhaliwal first reported to the SEC what she reasonably believed to be violations of SEC regulations and securities law violations, including the Defendant's retaliation against her for having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct.

51.     In addition, viewing it as a matter of moral and civic duty, Ms. Dhaliwal on **May 21, 2015** and **August 4, 2015** voluntarily provided information concerning what she reasonably believed to be violations of the FCA and AKS and other violations of law to the DOJ, and other regulatory agencies.

52.     Similarly, Ms. Dhaliwal voluntarily provided information to the SEC on **May 21, 2015** and **August 4, 2015**.

53.     Ms. Dhaliwal continued to repeatedly raise concerns about and object to Defendant's improper and unlawful conduct internally and/or to the Company's counsel through her counsel, throughout her tenure.

54.     Ms. Dhaliwal also continued to provide information to the SEC relating to what she reasonably believed to be violations of the securities law and related violations, including Defendants' unlawful retaliatory acts against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants' improper and unlawful conduct.

55.     Ms. Dhaliwal's concerns were not taken seriously and as a consequence of having raised them she was punished by the Defendants. The retaliatory acts against Ms. Dhaliwal were blatant and horrendous and, ultimately, she was terminated from her position of employment on **March 26, 2018**. The factual and legal basis for her claims are detailed more fully below.

## **FACTUAL ALLEGATIONS**

**Ms. Dhaliwal Repeatedly Raised Concerns Regarding Potential Securities Law Violations, Including Violations of Rule 21F-17 Pursuant to the Securities and Exchange Act of 1934, as Amended, Investor Fraud, Violations of the FCA and AKS, Among Other Violations of Laws and Was Retaliated Against**

56.     On **November 26, 2014**, Ms. Dhaliwal objected that the Company provided no product or compliance training. On **October 15, 2014**, email from then-National Director, Market Access Kari Smith ("National Director K. Smith"), admitting the lack of adequate training, stated in pertinent part:

> "Just wanted to comment on the decks. We will be seeking approval for the entire contents of the main deck to be presented by the AD [(Account Director)]. However, I certainly understand that the training in order to do so is substantial, and we are nowhere close to having the knowledge base at this time. In fact, we may decide as a team that it is best to always have the payer MSL conduct the clinical overview."

57.     On **August 28, 2014,** Ms. Dhaliwal attended a meeting with Director HEOR Liaison John Niewoehner, PharmD, BCPP ("Director Niewoehner") and then-Associate Director, Market Access Nate Dewitt ("Associate Director Dewitt") at the Omni Hotel in Providence, Rhode Island to further prepare for a meeting with BCBS RI.

58.     During this meeting, as well as through other communications with her Market Access colleagues, Ms. Dhaliwal attempted to obtain Acthar's exact Wholesale Acquisition Cost ("WAC"), not a ballpark figure or an approximation.

59.     It is an industry standard to provide Market Access professionals with up-to-date pricing figures, such as WAC and Average Wholesale Price ("AWP"), among other things. The information presented needs to be accurate.

60.     In an effort to obtain the exact WAC cost of Acthar, Ms. Dhaliwal sent emails to certain of her Market Access colleagues that same morning.

In response to one such email, Associate Director, Market Access Anne Van Beveren ("Associate Director Van Beveren"), stated:

"I'm not sure we have a WAC, to be honest. That's a Mike question, but do let me know what you find out. I've never been asked that!"

In response, Ms. Dhaliwal, stated:

"He told me he thought it was $31,000, but I wanted to see if we knew the exact WAC in case we get asked."

In a separate email exchange, Associate Director, Market Access Brian Smith ("Associate Director B. Smith") replied, in pertinent part:

"The current WAC is $31,626 per Acthar® Gel vial."

61.     While waiting for responses from her colleagues, Ms. Dhaliwal also researched the public domain where she uncovered a document that included pricing figures for a number of drugs, including Acthar. This prompted further inquiries, as the document listed two different National Drug Code ("NDC") numbers for Acthar, each associated with a different price.

62.     Ms. Dhaliwal shared the information with Director Niewoehner, who did not know why this was the case.

63.     Drug products, such as Acthar, are identified and reported using a unique three-segment number, called the NDC, which serves as a universal product identifier for drugs.

64.     In a subsequent email to Associate Director B. Smith, Ms. Dhaliwal stated, in

pertinent part:

> "We have two questions from this information (1) why do we have two NDC #'s and (2)
> what is the reasoning for the price differential. Thanks for any insight. Our meeting is at
> 11AM. -Rose

| H.P. ACTHAR | 80 UNIT/ML | 63004773101 | $5794.5720/mL |
| H.P. ACTHAR | 80 UNIT/ML | 63004871001 | $6388.4520/mL |

> Price #1 $5794.5720 x 5 = $28,972.86
> Price #2 $6388.4520 x 5 = $31,942.26"

In response, Associate Director B. Smith, stated, in pertinent part:

> "Not sure why the 2 numbers and not sure why the number I gave you is different than
> these. Please let me know how it goes and what you find out!"

65.     This meeting represented the beginning of Ms. Dhaliwal's concerns regarding the

accuracy of Mallinckrodt's financial data concerning Acthar and caused Ms. Dhaliwal to further

investigate those issues as she was and remains concerned about the well-being of patients, as

well as, fraud upon the government, taxpayers and investors.

66.     On **August 28, 2014**, Ms. Dhaliwal attended a meeting with representatives from

BCBS RI. At this meeting BCBS RI alleged that the Company was engaged in unethical and

illegal conduct with respect to Acthar – violating patient privacy laws and federal laws under

Medicare – and further, among other things, requested the clinical data for Acthar that was

provided to the Food and Drug Administration ("FDA") during its most recent review to

maintain Acthar's use as an approved treatment for the other 18 disease states or uses (outside of

IS).

Later that same day, Ms. Dhaliwal sent an email to Director Sweeting and wrote:

"Hi Mike,

I just got on the train following the BCBS RI meeting. When you get a chance could you buzz my cell phone. I wanted to pass on some information to you from the plan asap, which they would like addressed. Being new at the Company, I don't have the knowledge to answer these questions. I was the note taker, so I have all of their questions/concerns/comments.

Thanks,

Rose"

Later that evening in a lengthy discussion with Director Sweeting, Ms. Dhaliwal reiterated the concerns raised by BCBS RI.

67.     Such serious allegations warranted a response from the Company's legal counsel or CCO Furey, but none was provided. Rather Director Sweeting tasked Ms. Dhaliwal with responding to BCBS RI.

68.     From **September 2-4, 2014**, Ms. Dhaliwal attended the Market Access & Trade Relations meeting held at the Clift Hotel in San Francisco, California, which meeting was led by Executive Director, Access Programs & Trade Relations Susan Foster ("Executive Director Foster"). In addition, the group also attended certain off-site meetings at the former Questcor Hayward, California office.

69.     During the **September 4th** meeting held at the Clift Hotel (the "September 4th Meeting"), Executive Director Foster emphasized her willingness to share information, as she wanted complete transparency within the group.  She expressed her concern over the risk she was taking – by acting in such manner – and emphasized to the team that such information must remain within their circle of trust (or words to that effect).

14

70.     At the **September 4th** Meeting, Executive Director Foster stated that she was extremely worried about Questcor's supply chain, which she viewed as the largest threat to the Company. Executive Director Foster further stated that given the sale of the Company, [David] Medeiros was a potential liability as he had left the Company and was the only person that knew the actual formula for Acthar.

71.     Executive Director Foster also stated at the **September 4th** Meeting that if the FDA knew that no one at the Company had information pertaining to the actual ingredients for the drug, the agency could open up the label for review and request that information, indicating that if that were to happen Mallinckrodt Pharmaceuticals would be shut down.

72.     Further, Executive Director Foster stated at the **September 4th** Meeting that when Questcor sold the Company to Mallinckrodt, they were provided with the ingredients/recipe in a file that is locked up and can't even be open, due to all of the protections in the file.  Executive Director Foster also stated that David Medeiros was the only person who had this information, and was the one that provided the file in this manner. According to Executive Director Foster, if the FDA questioned Mallinckrodt about this information, they would not have an answer, as they would not be able to open the file.

73.     Further, during the **September 4th** Meeting, Executive Director Foster stated that she felt squeezed between Questcor and Mallinckrodt, as Mallinckrodt wanted answers. In addition, she discussed a pending issue with an upcoming earnings call. Executive Director Foster stated that in the past she had to control Questcor, as they would outline specific paid and shipped rates with payers that were falsely inflated, as the numbers they stated to the investor community contained all the free drug the Company provided when a payer denied a claim.

Mallinckrodt did not understand and wanted to provide specific information regarding paid and shipped rates, i.e. approvals with payers, as they knew this information would make the stock rise. She stated that this was problematic because the Company had issues with Acthar's data that it was trying to fix.

74.     Subsequently, Ms. Dhaliwal raised what she reasonably believed to be securities law violations with respect to Executive Director Foster's statement to CCO Furey and/or Company counsel, Bentivoglio on **December 23, 2014**, **January 24, 2015** and possibly on other occasions, and further raised those concerns to CEO Trudeau and Board Member Bailey on **January 26, 2015**. In addition, Ms. Dhaliwal repeatedly raised concerns regarding Acthar's dirty data to CCO Furey and Company counsel Bentivoglio on **November 26, 2014** and **December 23, 2014** and possibly on other occasions, to CCO Furey on **January 16, 2015** and **January 24, 2015** and possibly other occasions and further, raised those concerns to CEO Trudeau and Board Member Bailey on **January 26, 2015**. Ms. Dhaliwal also raised concerns regarding violations of the FCA with respect to Acthar's dirty data, and orally communicated to CCO Furey and Company counsel, Bentivoglio that the issues surrounding Acthar's dirty data constituted securities law violations when the Defendants knowingly used Acthar's dirty data to make material misrepresentations to the public based on that data.

75.     During the California meeting, Ms. Dhaliwal again communicated her concerns regarding the allegations made by BCBS RI, as a response was needed.

76.     Subsequently, in **September 2014**, Ms. Dhaliwal was informed by Director Niewoehner, that Mallinckrodt did not have the clinical data and it likely did not exist. He further

explained then-Questcor Chief Scientific Officer David Young ("CSO Young") was not cooperating with the Company.

77.     On **September 19, 2014,** Ms. Dhaliwal again by email raised concerns that a substantive response to BCBS RI's serious legal concerns had not yet been provided. As BCBS RI responded within minutes to the non-responsive response that Ms. Dhaliwal was directed to provide.

78.     During a conference call on **September 24, 2014** (the "**September 24th Call**"), Ms. Dhaliwal was assigned an improper project by her supervisors, Director Sweeting and National Director K. Smith, related to formulating a consensus statement for Acthar to overcome the "lack of data" issue and the Medicare hurdle that Acthar was "well-established" in clinical practice for an indication/use, with the intent to increase reimbursement or paid and shipped rates for Acthar with Payers, specifically Medicare.

79.     Both Director Sweeting and National Director K. Smith, directed Ms. Dhaliwal to use Dr. Peter Kinkel ("Dr. Kinkel") as the advocate to formulate such statement.  Dr. Kinkel is a paid speaker and a high prescriber of Acthar.  In addition, Dr. Kinkel had earned compensation and would earn further compensation from the Company for his efforts in aiding Mallinckrodt overcome this challenge with government Payers and others.

80.     In furtherance of their desire to formulate a consensus statement for Acthar, National Director K. Smith, sent Ms. Dhaliwal an email with an internal document from Allergan attached – a prior employer of hers – to serve as the prototype for this project.

81.     During the **September 24th** Call, National Director K. Smith, stated:

"I've used this tactic successfully at Allergan and I believe we should implement it at Questcor. In order to view its effectiveness, we thought you should be the lead and test it

with FLRX, as it's a 'low risk' account. This is a strategy to help us overcome the 'lack of data' issue/challenge we are experiencing with payers, especially with Medicare and increase our reimbursement rates. Medicare requires as one of its coverage requirements the drug is "well-established" for the indication/use in clinical practice ie the local medical community, if dealing with local Medicare carrier making the decision or Regional Managed Medicare plan. We addressed this in a different way in the Harvard Pilgrim letter."

After some further discussion and questions raised by Ms. Dhaliwal, Director Sweeting, stated:

"If we utilize this strategy this way, we can flip payer accounts and increase paid/shipped rates ie sales. Nick from Marketing suggested this awhile back."

82.      In short, Ms. Dhaliwal's supervisors were instructing her to misrepresent the actual clinical data concerning Acthar in order to alleviate the reimbursement hurdle by government payors to improperly increase Acthar sales, essentially causing the submission of false or fraudulent claims for payment or approval. Ms. Dhaliwal was unwilling to engage in such unethical and illegal conduct.

83.      On **September 25, 2014,** Ms. Dhaliwal sent an email to National Director K. Smith, Director Sweeting, Associate Director Dewitt and Director Niewoehner, which stated:

Subject: RE: Harvard Pilgrim letter

"Hi Kari,

I apologize for the delay in my response. Being new, it took me more time than I had anticipated to review the Harvard Pilgrim draft letter. Without having been present at the actual meeting with the payer or being involved in the drafting of this letter to date, my comments are limited and captured in a more general sense in bullet form below.

- Adverse event/safety profile – Not captured in the letter in its current state. In addition, verbiage should be reviewed any place adverse event information is mentioned to make sure the letter characterizes these appropriately and doesn't mislead the reader, by providing only a partial view ie info only on serious adverse events.

18

- Verbiage pertaining to rationale for not conducting placebo controlled randomized studies, due to practicality of the trial should be reviewed. Payers will ask about R&D spend and what the Company has done as far as clinical trials, since the price increase. In my professional opinion, this needs to be addressed, as this answer will not go over well with the payer, especially, if we are asking them to consider a change to their medical policy and continue to pay for the indications, which the payer has removed from their coverage policy. *Perhaps John can weigh in on this one, as he may have further thoughts.*

- Compendia fair balance statement – Verbiage needs to be reviewed, as this statement should not be down played based on the observation the Compendia is not citing any specific clinical evidence to support the assessment of the product having "limited therapeutic value." A subsequent paragraph, outlines the Company's rationale for not conducting randomized placebo controlled trials. It's my opinion, these statements are contradictory and a "fair balance" statement needs to do exactly what its intent is ie give a "fair" picture, which is not the case in the letters current state.

- Internal data regarding cases – To my knowledge this data is not fully accurate and the Company is working to correct it. Thus, I would not include it.

- Biased view – When asking a payer to change their medical coverage policy to pay for indications, which are currently not covered under the plans policy, then it's my opinion the letter needs to be adjusted to provide the payer with a fair assessment of the elements of the drug that they could, in fact, base a decision on, without having to open up references and fact check, if they so desired.

- Signature – I'm in agreement with Nate that this letter should be approved and signed by a member of Sr. Management from clinical/Medical, as the contents of this letter, warrants such signature.

Please let me know if you have any questions regarding my overall comments to the Harvard Pilgrim letter.

Kind Regards,

Rose"

84.    Not a single Company executive responded to her concerns regarding the Harvard Pilgrim letter. Rather than addressing Ms. Dhaliwal's legitimate concerns, she was belittled for providing such comments by her then-supervisor, Director Sweeting. This conduct was an

intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper conduct internally.

85.     During **October 2014**, the Company embarked upon a campaign of intense and relentless retaliation against Ms. Dhaliwal. Director Sweeting began to ridicule and laugh at her and at other times berate her. The more Ms. Dhaliwal raised concerns the more she was berated and marginalized.

86.     On **October 7, 2014**, during a call with Director Sweeting, Ms. Dhaliwal reiterated her concerns that BCBS RI had accused the company of violating Federal laws. Director Sweeting's response was to laugh and to advise Ms. Dhaliwal that there were no issues, except for the data issue, and to imply that she was overreacting.

87.     Ms. Dhaliwal continued to raise concerns – orally and in writing – to various individuals within the Company with respect to Mallinckrodt's approach with Payers and the negative consequences of its strategy of ignoring routine requests from payers, among other concerns. Rather than take appropriate action, the Company continued to dismiss her concerns and subjected her to further retaliatory acts.

88.     Following the **October 7, 2014** call, the retaliation against Ms. Dhaliwal intensified. She was chastised for, among other things, putting her concerns in writing, taking notes at meetings, and even for raising appropriate employee concerns regarding her Company vehicle, and the beratement of her performance became a regular work life reality for her. Ms. Dhaliwal continued to raise concerns regarding the company's improper and potentially illegal conduct, as she had a responsibility to do so, and the Defendant's responded with retaliatory measures designed to render her work life more and more miserable.

20

89.     From approximately **October 8-13, 2014**, without having any prior knowledge that the Company's co-pay assistance programs were under scrutiny by investigators, Ms. Dhaliwal was sending emails to her superiors regarding such topic in an effort to address questions by Payers, to understand the programs offered by the Company and to evaluate their impact with her assigned Payer accounts.

90.     No substantive guidance was provided to Ms. Dhaliwal by Director Sweeting, other than having directed her to the Company's website or having informed her that these programs will be discussed in greater detail during the ARD Reimbursement Hub Meeting in Florida.

91.     On **October 9, 2014**, BCBS RI Clinical Pharmacist / Medicare, LoriAnn Collins RPh, MBA ("Ms. Collins"), sent an email to Director Sweeting.

Subject: accredo

Ms. Collins, stated, in pertinent part:

"Just wanted to let you know that I personally received a call from Accredo – regarding a patient.

This is very disconcerting…since I have no reason to be speaking with this pharmacy. Again, not quite sure of the relationship with you all, but they really need to stop."

92.     On **October 10, 2014,** during a call with Director Niewoehner, he conceded to Ms. Dhaliwal that Acthar is not highly purified ACTH 1-39 as represented to the public.

Director Niewoehner, stated:

"So it's not only ACTH 1-39, there's these other small ACTH 1-14, ACTH 1-17, ACTH 1-9 all these other smaller fragments of ACTH which we believe helps give Acthar its potency and physiological effects – now we can't say that, although our clinical R&D group has this data, they've analyzed what's in an actual vial of Acthar gel – so that's why we include this statement that it's a complex formulation – includes ACTH 1-39 the full umm amino acid chain, but has potentially other active peptides.  Well there is umm

and not that we would not that payers would care. For your own knowledge, **there's other shit in the vial.**" Emphasis added.

93.      During the same **October 10th** call, Ms. Dhaliwal had asked Director Niewoehner what his thoughts were regarding her comments to the Harvard Pilgrim letter. Director Niewoehner mentioned that they all seemed reasonable and generally agreed with her comments, yet, just days earlier Ms. Dhaliwal was belittled by her then-supervisor, Director Sweeting for providing such comments.

94.      Ms. Dhaliwal continued to reiterate her concerns to Director Niewoehner, as he mentioned that a template or general payer letter was under development (similar to the Harvard Pilgrim letter) to utilize with those payers that don't want to meet with the Company, particularly, in those instances when a payer implements a change to its medical policy that is detrimental to Acthar's reimbursement.

95.      On **October 14, 2014**, Ms. Dhaliwal traveled to Lake Mary, Florida to attend an ARD Reimbursement Hub meeting (the "ARD Hub Meeting") concerning Acthar that began the following morning, **October 15, 2014**, which included a site visit to the Company's reimbursement hub, United BioSource Corporation ("UBC"), led by Program Manager, Marj Futia.

96.      Later that same day, on **October 15, 2014**, during the portion of the ARD Hub Meeting held at the Marriott Hotel Boardroom in Lake Mary, Florida, the group attended a session about the Company's Patient Assistance Program ("PAP") and Copay Assistance led by Manager, Assistance Programs April Scott ("Manager Scott"). During this session, Executive Director Foster informed the group that the information presented must remain "completely confidential". Executive Director Foster further communicated that she is "constantly being

22

questioned by investigators on what's in emails about this topic, as they want to know". Director Sweeting and Manager Scott chimed in to heighten the fear they were instilling in all of the Company's employees and reiterated to the group that the information communicated to them was not to leave the room or be shared with an account.

97.     Ms. Dhaliwal, from whom Cigna had requested information regarding the Company's co-pay assistance programs, was at a loss as to how to proceed. It was not her practice to ignore routine requests for information from Payers.

98.     Ms. Dhaliwal asked for further advice, as to what she could send over email and what she could say to Cigna. Director Sweeting, laughed and said, I bet they want to know. Executive Director Foster, stated, Rose I gave you two options. Ms. Dhaliwal responded, the (1) website and (2) talk in circles. Executive Director Foster, replied, yes… we support foundations and have co-pay assistance, offer no details.

99.     During the **February 13, 2015** meeting at Skadden, Ms. Dhaliwal, asked Company counsel, Bentivoglio, that if a client asked him a question regarding the firm's website, would he continue to direct the client to Skadden's website, rather than answer their question. Company counsel, Bentivoglio, communicated, in sum or substance, that such a question presented a different issue. Ms. Dhaliwal disagreed.

100.     During a business plan session led by Executive Director Foster on **October 15, 2014**, Ms. Dhaliwal was forced to speak up about the improper project assigned to her on **September 24, 2014**, as Executive Director Foster planned to include this project in the Company's **2015** operational plan for Acthar.

101.    Ms. Dhaliwal initially attempted a much softer approach to communicate what she perceived as issues regarding the assigned project. After that approach did not work, she stated her refusal to move forward with the project, as it was "illegal." She felt strongly the Company's legal/compliance department needed to further evaluate this project, prior to having her execute on it.

102.    On **October 16, 2014**, Ms. Dhaliwal attended the final day of the ARD Hub Meeting, which included an Analytics/Tools update session led by then-Associate Director, Contracts and Managed Markets Marketing David Lo ("Associate Director Lo"), who described the issues concerning Acthar's data.

Associate Director Lo, stated:

"Current data is so dirty that's why BizInsights[1] is having a hard time providing the Market Access team a payer report to utilize, supposed to provide in November 2014, but suspect."

103.    Moreover, Associate Director Lo, informed the attendees of numerous issues that existed with Acthar's data that made it so "dirty." Such issues included, without limitation: (i) missing data records; (ii) major issues with historical data, pre 2nd half of 2013; (iii) makes looking at trends challenging; (iv) Payer name mistakes, such as: spelling errors, errors with sub-plans and a lack of standardization naming payers and sub-plans; (v) Microsoft Excel spreadsheets used to capture and generate database, limitations exist with this format; (vi) previous to any data agreements with specialty pharmacies, any data received by Questcor/Mallinckrodt was sheer luck, thus the organizations lacked and still lack reported data – Questcor's thought process was why pay for something if we are already getting it – numerous

---

[1] BizInsights, Inc. was hired to create a new tool to scrub Acthar's data.

issues, as no controls over what data is received and the frequency of that data; and (vii) manual data entries.

104.    When Ms. Dhaliwal asked Associate Director Lo how the Company currently looked at data for the various payer types, such as commercial, Medicare, Medicaid and dual eligibles, Associate Director Lo stated: "right now, no capability [exists] to look at Medicare, Medicaid or commercial lives for individual payers ie scripts."

105.    The concerns surrounding the integrity of Acthar's data were heightened by the fact that a material gap existed with respect to the Company's dispensing (or prescription claims) data, as such information was communicated to Ms. Dhaliwal during a conversation with Executive Director Foster, while discussing the Company's relationship with CVS Caremark.

 Executive Director Foster stated:

"No contract in place. Bad blood. CVS Caremark wanted discounts and Questcor wouldn't provide any. CVS Caremark refused to do any business with both Questcor and Mallinckrodt. Won't provide any data. The Company has been shifting business from CVS Caremark over to other specialty pharmacies over the years."

106.    During a subsequent conversation with Executive Director Foster, Ms. Dhaliwal asked Executive Director Foster, why Acthar had two different NDC numbers and further, inquired about Acthar's current WAC. She informed Executive Director Foster, that she had uncovered two different NDC numbers for Acthar in **August 2014**, while preparing for a meeting with BCBS RI and each NDC number was associated with a different cost.

In response, Executive Director Foster, revealed the existence of a fraudulent scheme, stating:

"The reason Acthar has two NDC numbers is because Questcor wanted to lower their Medicaid rebate payments to the government. In order to do this they needed a new NDC number issued for the drug. The Company was previously paying much higher rebates to the government with the previous NDC number. Questcor worked with CMS and the

FDA to get this new NDC number for H.P. Acthar gel, which became effective Jan 1, 2013. At the same time, Questcor retired the old NDC number."

Executive Director Foster instructed Ms. Dhaliwal to keep this information to herself, as it had not been publicly disclosed.

107.    Subsequent to the ARD Hub Meeting, during an impromptu call with Director Sweeting on **October 17, 2014**, Ms. Dhaliwal was yelled at and advised that her behavior at the Florida meeting was inappropriate, that she should not have raised the issue of how to understand and how to handle questions from Payers, such as Cigna, regarding the Company's patient assistance programs, other than provide a non-responsive response, as her colleagues understood the direction and did not ask additional questions. Moreover, Director Sweeting, informed her that she was challenging the organization constantly, bringing up BCBS RI and warned her that she was out of line. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

108.    During various times from approximately **October 14-31, 2014**, Ms. Dhaliwal was bombarded with emails questioning her knowledge, her integrity and her understanding of the issues from her supervisor, Director Sweeting and Associate Director Access & Reimbursement, Kathleen Breton ("Associate Director Breton") after she informed them that Cigna had requested that Providers cease using the Acthar specific Prior Authorization ("PA") form effective immediately, as Cigna has transitioned to a universal PA form. Further, any Acthar PA requests submitted to Cigna by the Company's reimbursement hub, UBC, must also comply with Cigna's requirements. This conduct was an intentional act of retaliation against Ms.

Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

109.     Ms. Dhaliwal continued to follow-up with Cigna to address Director Sweeting and Associate Director Breton's constant stream of questions to avoid any misunderstandings.

110.     During a call on **October 31, 2014**, Ms. Dhaliwal again objected to the work-around previously suggested to Ms. Dhaliwal by Director Sweeting and Associate Director Breton, to allow the Company's reimbursement hub, UBC, to continue to submit Cigna's Acthar specific PA form as a supplement to the universal PA form, along with other purported essential documents to improperly obtain approvals for Acthar.

111.     Shortly after that call, on or about **October 31, 2014**, in retaliation for her having raised concerns Ms. Dhaliwal was subjected to a technical assault by the Company, whereby she was unable to send emails using her Company laptop. This caused an immense amount of stress upon Ms. Dhaliwal, as she was trying to send certain documents to her supervisor to meet the stated deadlines set forth by Director Sweeting.

112.     On **November 3, 2014**, Ms. Dhaliwal reached out to the Company's IT helpdesk to discuss the error messages and IT issues she experienced on **October 31, 2014**. The IT personnel was beyond rude and made her uncomfortable.

113.     For instance, while having remote access to Ms. Dhaliwal's laptop the IT personnel proceeded to type the word "twat" instead of "test" on her laptop screen, before he deleted "twat" and re-typed "test," prior to sending it. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

27

114.    On **November 4, 2014** (the "**November 4**[th] Email"), to ensure the Company and

its reimbursement hub, UBC, among others, complied with Cigna's requirements going forward,

Ms. Dhaliwal sent an email to Director Sweeting to forward to the appropriate personnel in the

Company's legal/compliance department for approval and further guidance regarding its

distribution.

> Subject: Message For Legal Review – Cigna Prior Authorization Form Change, Effective
> Immediately
>
> Mike – See below. This message is ready for legal review. Please let me know if you
> have any questions.
>
> Dear All,
>
> This message is to inform you of a change to the prior authorization forms, which are
> submitted for H.P. Acthar® gel to Cigna Healthcare "Cigna". Effective immediately,
> Cigna's prior authorization form specific to H.P. Acthar® gel, should **_no longer be_**
> **_utilized_** by providers when submitting prior authorization requests to the payer. Cigna is
> in the process of removing the prior authorization form **_specific_** to H.P. Acthar® gel, from
> their website.
>
> Cigna has requested that all providers utilize Cigna's universal prior authorization request
> form for H.P. Acthar® gel moving forward, except for California, New Mexico, Arkansas,
> Louisiana and Mississippi. Providers in the aforementioned states should utilize the state
> specific universal prior authorization form designated by Cigna, as those forms meet
> certain state specified requirements.
>
> Once again, this change is effective immediately.
>
> Kind Regards,
>
> Rose"

115.    Upon information and belief, Defendants, including its third-party agents, did not

comply with Cigna's request.

116.    On **November 4, 2014**, she attended a web-ex meeting with Director Niewoehner,

to review a Microsoft PowerPoint slide presentation for Acthar, as these slides were intended for

28

use at an upcoming meeting with Horizon Blue Cross Blue Shield of New Jersey ("Horizon") on **November 6, 2014**.

117.    During the web-ex, she noticed certain slides that were not yet approved by the Company's legal department commingled in the presentation.  She raised concerns on each of these slides and stated that if they are not approved they could not be used. Her concerns were met with silence by her supervisor, Director Sweeting.

118.    Following this call, Director Sweeting refused to provide Ms. Dhaliwal with an approved version of Acthar's <u>clinical slide deck</u> to review, which she ultimately received from Director Niewoehner, on **November 5, 2014**, only after pleading with him.

119.    On **November 4, 2014**, while reviewing certain of the content included in Acthar's business slides provided to Ms. Dhaliwal for use with Horizon, it prompted her to ask additional questions in an email to Director Niewoehner, with a copy to Director Sweeting. Certain of her questions are included below.

For instance, Ms. Dhaliwal, asked, in pertinent part:

"I had a few questions on slide #9, could you please clarify if the drug [(Acthar)] has orphan status for nephrotic syndrome, dermatomyositis, polymyositis, sarcoidosis or if the Company has applied for orphan status for these conditions, thanks. I just want to understand how to explain this, if the payer poses the question."

In response, Director Niewoehner, states, in pertinent part:

"Acthar does not have orphan drug status for any other disease outside of infantile spasms and as far as I'm aware ARD has not applied for orphan drug status outside of infantile spasms."

In a second question concerning the Horizon slide deck, Ms. Dhaliwal, asks:

"Would you mind explaining the difference between "orphan status" versus "orphan positioned" and "orphan like" thanks"

In response, Director Niewoehner, states, in pertinent part:

"Orphan status is granted by the FDA for medications used in treating patients afflicted with a particular disease with a prevalence of 200,000 or less patients. Orphan positioned & like is more of a vision of the company in terms of the appropriate patient population for Acthar."

120.    On **November 5, 2014**, Ms. Dhaliwal continued to raise concerns in writing to both Director Niewoehner and Director Sweeting, regarding the slides provided to her for use with Horizon.

For example, Ms. Dhaliwal, stated, in pertinent part:

"If we are going to use the numbers on a slide to a payer they should be sourced appropriately and the data shouldn't contradict each other. We should also understand how the numbers are derived, as this is an important point."

121.    Ultimately, on **November 6th** at approximately 12:55AM the day of the meeting, Director Sweeting approved the slides for use with Horizon.

122.    Preparing for a Payer meeting in this manner made it extremely difficult for Ms. Dhaliwal and caused her to work around the clock. She was sending emails at approximately 4:19AM the day of the meeting, as Ms. Dhaliwal did not feel comfortable making statements to Horizon that were not appropriately referenced in the slide presentation, among other things. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

123.    During the **November 6, 2014** meeting with Horizon (the "November 6th Meeting"), Horizon's Director, Clinical Programs Saira Jan, M.S., Pharm.D. ("Dr. Jan") made several relevant comments and routine requests for information, certain of which concerned the Company's utilization data for Acthar.

30

124.     Dr. Jan wanted to compare Horizon's internal claims data for Acthar against the Defendant's data, to ensure that the claims data presented by the Defendants to Payers was accurate. Ms. Dhaliwal was not allowed to respond to Horizon's routine requests for information. To her knowledge, no one from the Company responded to Horizon's specific requests for information following the **November 6th** Meeting. Except for Mallinckrodt's stiff-arm strategy of ignoring payer concerns and/or providing evasive responses, the payers concerns went unaddressed by Defendants. In **January 2015**, Horizon revised its medical policy significantly limiting Acthar's reimbursement. Ms. Dhaliwal communicated this information to CCO Furey. Defendants conduct in this regard did grave harm to Ms. Dhaliwal's reputation in the industry.

125.     On **January 26, 2015**, Ms. Dhaliwal raised concerns *via* email to Mallinckrodt's CEO Trudeau and Board Member Bailey, which stated, in pertinent part:

> "[i]t is now nearly two months since I provided the CCO with copies of slide decks regarding a presentation the Company made to Horizon and about which I had expressed serious concerns, yet I am told the Company is still 'evaluating' the presentation. During this 'deliberative' process the Company continued to ignore information requests it had received from Horizon months ago. It was without question that the Company's decision to frustrate Horizon's request negatively impacted the Company and me, as such non-responsiveness us an unacceptable corporate strategy. Thus, it should come as no surprise to you gentlemen that Horizon further restricted its medical coverage policy for Acthar."

126.     Ultimately, on **November 21, 2014**, pursuant to the Company's Employee Handbook, Ms. Dhaliwal redirected her concerns *via* email to Mallinckrodt's CEO Trudeau and Board Member Bailey.

Subject: Concerns Regarding Company's Business Activities

Ms. Dhaliwal's email stated:

"Dear Messrs Trudeau and Bailey:

31

I am currently employed by the Company as an Associate Director, Market Access, responsible for maintaining favorable reimbursement coverage for H. P. Acthar Gel with both commercial and government payers in the Northeast.

For the past ten weeks, I have advised not only my immediate supervisor, Mike Sweeting (Director, Market Access), but also Kari Smith (National Director, Market Access) and Susan Foster (Executive Director, Access Programs & Trade Relations) that the Company was engaged in unethical, and potentially illegal, business activities. Unfortunately, these questionable business activities continue unremediated. Pursuant to the Company's Employee Handbook, I believe that complaints of this nature need to be elevated to the both of you. Please advise when you are available to meet and/or speak with me, regarding these very serious concerns.

I have nearly fifteen years of experience in the pharmaceutical industry. I believe that the Company's future success depends, in great part, upon it quickly and efficiently correcting these concerns. Your prompt attention to the within is required.

Sincerely,

Rose Dhaliwal"

127.    Later that evening on **November 21, 2014**, Mallinckrodt's CCO Furey, responded

to Ms. Dhaliwal's earlier communication to CEO Trudeau and Board Member Bailey.

Subject: Concerns

"Hello Rose,
I am the Chief Compliance Officer for Mallinckrodt Pharmaceuticals. Your concerns regarding our business activities have been forwarded to me. I would like to setup time to discuss your concerns. I am overseas at the moment but can speak with you on Monday. Please let me know your availability on Monday. I can also find time to speak this weekend but my availability is more limited with the time difference and travel schedule. Sincerely,

Raymond Furey"

128.    In response to CCO Furey, on **November 23, 2014**, Ms. Dhaliwal stated, in

pertinent part:

"I have an enormous amount of material, that I'd want to set up a time to meet with you."

129.    On **November 24, 2014**, Mallinckrodt's CCO Furey informed Ms. Dhaliwal for the first time that their scheduled meeting on **November 26, 2014** would take place at the offices of Company counsel, Skadden and, in particular, Bentivoglio would be assisting the Company. The purpose of holding the meeting at Skadden was to intimidate Ms. Dhaliwal by forcing her to come to an unfamiliar location at a time of a high level of stress in her life.

130.    On **November 26, 2014** (the "**November 26th** Meeting"), an internal investigation led by the Company's existing counsel, Bentivoglio, along with CCO Furey was commenced with a meeting at Skadden. Ms. Dhaliwal attended accompanied by her then-counsel, Mark Mandel, Esq. ("Mandel").

131.    Ms. Dhaliwal spent a considerable amount of time discussing her initial client meeting with BCBS RI and the allegations of unethical and illegal conduct, in particular, violations of Federal Medicare laws and violations of the Health Insurance Portability and Accountability Act ("HIPAA").

132.    Further, she communicated that BCBS RI had specifically requested Acthar's clinical data that was provided to the FDA during its most recent label review to maintain Acthar's use as an approved treatment for the other 18 disease states or uses (outside of IS).

133.    BCBS RI had asked about the Company's relationship with Accredo Specialty Pharmacy and its reimbursement hub, UBC. BCBS RI had also inquired about the Company's co-pay assistance and foundation support, alleging that Mallinckrodt's third party representatives were informing patients they would not have to pay their co-pay. Further, BCBS RI alleged that Mallinckrodt's third-party representatives were contacting BCBS RI representatives and acting improperly requesting information regarding Medicare and non-Medicare patients and harassing

them. They said it constituted violations of law, particularly when the patient's specialty pharmacy is not Accredo.

134.    In addition, BCBS RI inquired whether the Company's Medical Model Policy for Acthar would also be provided to the sales reps as a selling tool to define appropriate use.

135.    Ms. Dhaliwal provided the names of the BCBS RI meeting attendees besides herself: (i) BCBS RI Medical Director, Peter Hollman, MD; (ii) BCBS Clinical Pharmacist / Medicare, LoriAnn Collins RPh, MBA; (iii) BCBS, Dan Curran; (iv) Director Niewoehner; and (v) Associate Director Dewitt.

136.    Ms. Dhaliwal conveyed to both CCO Furey and Company counsel, Bentivoglio, that she had advised Director Sweeting about the allegations of illegal activity and that BCBS RI had demanded answers. Ms. Dhaliwal said she raised the issues with her supervisor because she was ill equipped to make a response and she felt uncomfortable doing so. Although, Director Sweeting initially said he would have Associate Director Dewitt handle it, that was not the case. Director Sweeting became belligerent and condescending towards Ms. Dhaliwal and continued the Defendants campaign to make her feel more uncomfortable. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to the Defendants improper and unlawful conduct internally.

137.    Since Director Sweeting was pressuring Ms. Dhaliwal to reply to BCBS RI she reached out for assistance to Director Niewoehner, who previously had cautioned Ms. Dhaliwal not to say much about Acthar's data because Mallinckrodt did not have the data, which likely did not exist. Director Niewoehner was supposed to have met with CSO Young in Baltimore, prior

34

to CSO Young exiting the Company, to obtain the information for Mallinckrodt. However, Director Niewoehner indicated that CSO Young was not cooperative.

138.    Ms. Dhaliwal was pressured by Director Sweeting and Director Niewoehner to give an evasive response to BCBS RI, which she did on **September 19, 2014**. She expressed concern that this would reflect poorly on her and the Company. CCO Furey was unaware of what transpired at the BCBS RI meeting.

139.    Ms. Dhaliwal further described to Company counsel, Bentivoglio the improper project that National Director K. Smith and Director Sweeting assigned to her, which concerned formulating a consensus statement for Acthar to overcome the "lack of data" issue and the Medicare hurdle that Acthar was "well-established" in clinical practice for an indication/use. The Company's intent in doing so was to increase reimbursement or paid and shipped rates for Acthar with Payers, specifically Medicare.

140.    Ms. Dhaliwal broke down the steps to make it simple to understand. She further informed Company counsel, Bentivoglio and CCO Furey that National Director K. Smith had not only communicated to Ms. Dhaliwal that she had used this tactic successfully at her prior company, Allergan, but she further provided Ms. Dhaliwal certain Allergan documents to use as a prototype. She also communicated that Allergan had recently settled a suit for approximately $600m.

141.    Ms. Dhaliwal explained to Company counsel, Bentivoglio, and CCO Furey that she was uncomfortable with the concept and her concerns heightened when Executive Director Foster requested Ms. Dhaliwal include it in Acthar's **2015** operational plan.

142.     During a team meeting in Lake Mary, Florida, Ms. Dhaliwal was put on the spot by Director Sweeting – in the presence of approximately twelve of her colleagues – after he became agitated with Ms. Dhaliwal, claiming to not understand what she was stating after she walked them through the different steps involved with formulating a consensus statement, including the payment to Dr. Kinkle and the intent of the project and why the project should be vetted through the Company's legal department, prior to including it in Acthar's **2015** operational plan. Finally, when pressured by Director Sweeting regarding her concerns, Ms. Dhaliwal stated, because it's "illegal".

143.     Ms. Dhaliwal also recounted to Company counsel, Bentivoglio and CCO Furey that during the Lake Mary, Florida meeting Executive Director Foster had communicated that she was being questioned by government investigators about what was contained in emails concerning the Patient Assistance Programs ("PAP") and that the information surrounding the Company's PAP programs must be kept confidential. Ms. Dhaliwal explained to Company counsel, Bentivoglio and CCO Furey that the TPAP/PAP program is a sham, as the Company's reimbursement hub continues to seek reimbursement through Payers for Acthar vials that have already been provided to patients at no cost.

144.     Director Sweeting had asked Ms. Dhaliwal to perform "deep dives" into Acthar's data and after doing so, she became very concerned because it caused the government to overpay for Acthar.

145.     Ms. Dhaliwal communicated to CCO Furey the issues surrounding Acthar's "dirty" data, such as that certain data did not exist, while other data was inaccurate, as well as

communicating other concerns surrounding the deficiencies with the Company's IT infrastructure to support Acthar's data that were outlined to her by Associate Director Lo.

146.    She further communicated to Company counsel, Bentivoglio and CCO Furey that Associate Director Lo had informed her that there was no way to access any raw data feeds sent to the data warehouse, which is why the Company was using so many Microsoft Excel spreadsheets.

147.    Moreover, Ms. Dhaliwal informed CCO Furey that she was aware that the Company was getting ready to move the data warehouse from its current location in Anaheim, California to either the Hayward, California office or a remote location nearby.

148.    Ms. Dhaliwal reiterated to CCO Furey her concerns that the issues surrounding Acthar's dirty data caused the government to overpay for Acthar, among other things.

149.    Following the discussion concerning Acthar's dirty data, as well as Questcor's data warehouse, CCO Furey and Counsel Bentivoglio left the room to talk amongst themselves.

150.    Ms. Dhaliwal also discussed with Company counsel, Bentivoglio and CCO Furey the issues surrounding Defendant's pressuring physicians to submit letters of medical necessity, whether a medical need existed or not; issues with Acthar's drug sampling program; as well as the Horizon **November 6th** Meeting issues surrounding the content of the slide decks, Acthar's dirty data, as well as Horizon's request for information, among other things.

151.    None of the concerns raised by Ms. Dhaliwal were resolved, and the retaliation against her continued unabated. Undeterred, Ms. Dhaliwal continued to object to illegal conduct including, but not limited to, the Company's ill-conceived plan to release a "consensus statement" concerning Acthar's clinical data that was plainly false.

37

152.     No matter how many details and facts Ms. Dhaliwal provided during the **November 26th** Meeting and others, CCO Furey and Company counsel, Bentivoglio, feigned that they did not understand any of what she was communicating.

153.     Skadden's representation of the Company in various matters assured that it would not conduct a thorough and impartial internal investigation.

154.     The retaliatory acts against Ms. Dhaliwal only worsened during the period of the internal investigation.

155.     At the conclusion of the **November 26th** Meeting, Ms. Dhaliwal was directed by CCO Furey not to communicate with external customers, commercial and government Payers. The company's cover up was taking shape. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and objected to Defendants improper and unlawful conduct internally.

156.     Notwithstanding the Company's written policies about retaliation and harassment, and CCO Furey's verbal assurances that such policies are strictly enforced, the harassment, intimidation tactics and retaliatory acts only worsened, from the time that she first raised her concerns, through her termination on **March 26, 2018**.

157.     On **December 1, 2014**, Ms. Dhaliwal provided CCO Furey the Horizon slide decks.

158.     On **December 9, 2014**, Ms. Dhaliwal was functionally demoted, her accounts now limited to only regional Payers in the state of New York – with the majority of the assigned accounts being relatively small – as opposed to national and significant regional Payers throughout the Northeast region, as was her responsibility previously. This change negatively

impacted her future prospects. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

159.    From approximately **December 12-19, 2014,** Ms. Dhaliwal was unable to log-in to the new expense system and asked for assistance. She reported this to various individuals within the Company. In return, she got the run around. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

160.    On **December 15, 2014,** Ms. Dhaliwal received no pro-rata bonus payment for 2014, which she was entitled to receive according to the terms of her engagement. Further, for pay period ending, **December 15, 2014** the company erroneously increased her taxable wages by $1,127.92 for driving a rental vehicle approximately thirty (30) personal miles in Fiscal Year 2014, which equates to approximately $37.60 per mile. This negatively impacted her net pay. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having raised concerns about and having objected to Defendants improper and unlawful conduct internally.

161.    On **December 16, 2014,** Ms. Dhaliwal sent the following email to CCO Furey, which stated in pertinent part:

> "I am anxious to continue our conversation regarding my concerns with respect to unethical and potentially illegal conduct at Mallinckrodt Pharmaceuticals. As I understand it, Company Counsel is going to make arrangements with my attorney, Mark Mandel, to schedule a 1 hour telephone call for this purpose. I will await his advice in this regard.
>
> A number of "other" things have occurred regarding my employment since I made my complaint to the CEOs, and since we last met, that require your attention. They appear to be clear indications of retaliation for my having made that complaint.

1. I was recently demoted (at what was supposed to be an intensive training) – functionally – so that I am now responsible for covering only regional, as opposed to national, accounts and my coverage list has been substantially downgraded. This negatively impacts my incentive compensation and my future prospects. There was no discernable business rationale given for this reorganization. All indications are that my demotion was instigated by my having formalized my complaint;

2. I have been bombarded with an unmanageable amount of work that was accompanied by arbitrary, unrealistic, and unachievable deadlines. All of this seems calculated to "manage me out" of a job by falsely portraying me as a poor performer. This too seems to have been instigated by my having complained. In this regard, my supervisors have virtually ignored the protocol as it relates to the timing and substance – detailed in the Employee Handbook – for reviewing my performance. This obviously impacts my bonus compensation and potential promotions;

3. I was advised just yesterday that I was not receiving any 2014 bonus. While the notice contained some opaque reference to the merger agreement, awarding me no bonus does not comport with my employment letter that speaks to a 20% "target" and an "incentive compensation program as approved by the Board of Directors." That program was never shared with me nor was it explained to me why I should receive no 2014 bonus. This notification is, however, consistent with other economic pressures being placed on me. For instance, it was not until yesterday that the Company provided me with additional instruction to access the expense reimbursement platform, which, to date, has disallowed certain necessary business related expenses that I incurred, and failed to explain its mileage reimbursement calculations. Again the "no bonus determination," mileage calculation and expense reimbursement difficulties appear to have been instigated by my having formalized my complaint; and

4. My supervisors continue to instruct me to do – and my replacement has asked that I assist him in doing – preciously what you have told me not to do in terms of communicating allegedly faulty and unsubstantiated data to third parties. These contradictory instructions serve to place me in a completely untenable position internally and an embarrassing and potentially career threatening position externally. These "clients" have been waiting for answers to their questions in some instances, since August.  No explanation has been provided to these clients for my failure to respond to them and, consequently, they logically will conclude that I am unreliable and non-responsive.  This damages my reputation and credibility making it difficult, if not impossible, for me to work with them.

Having registered what I believe to be a very legitimate complaint/concern, it has, unfortunately, worked to my extreme detriment.  You have to look in to it and it must stop immediately."

In response, CCO – Furey stated, in pertinent part:

"[t]hank you for raising these concerns to me and I will look into these matters…"

162.     The retaliatory acts, however continued. During the internal investigation of her concerns, Ms. Dhaliwal was given tight deadlines by CCO Furey, to accomplish a variety of tasks assigned to her. Further, it was conveyed by Company counsel, Bentivoglio through Ms. Dhaliwal's then-counsel, Mandel, if she did not comply with CCO Furey's requests within the stated timelines there would be "consequences," while at the same time she was expected to be on conference calls with her team and new supervisor aiding in the transition of her national and high profile regional Payer accounts and further subjected to numerous administrative hurdles, among other things.

163.     Ms. Dhaliwal raised concerns regarding Company counsel, Bentivoglio's threat of consequences to CCO Furey on **January 24, 2015,** to Mallinckrodt's CEO Trudeau and Board Member Bailey on **January 26, 2015** and further, to her then-supervisor Sr. Director Harris on **January 28, 2015** (the "**January 28th Call**").

164.     During the **January 28th** Call, Ms. Dhaliwal repeatedly raised concerns to Sr. Director Harris that she has been working 24/7 on Mallinckrodt between the assignments from CCO Furey and everything else that she's been directed to do internally, as Company counsel, Bentivoglio communicated to her then-counsel that if she does not complete the assignments within the tight deadlines there will be "consequences." Ms. Dhaliwal further stated that she does not take "threats" lightly… that's "illegal". She is doing her job and she is doing as directed. She is working 24/7. She's delivering on everything and that's all that she can do. During that same call, Ms. Dhaliwal stated, if [she] does not meet these tight deadlines there will be consequences.

41

[She] does not take threats lightly. You don't say that to an employee, that's not appropriate.

Later that evening, on **January 28, 2015**, Ms. Dhaliwal was punished for raising these concerns, as CCO Furey placed Ms. Dhaliwal on a "temporary stand down." This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having raised concerns about and having objected to Defendants and their counsel, Skadden's improper and unlawful conduct internally.

165.    On **December 23, 2014**, in connection with the internal investigation, Ms. Dhaliwal participated in a conference call with Company counsel, Bentivoglio, and CCO Furey, and provided additional details regarding the concerns she had raised. Ms. Dhaliwal's then-counsel, Mandel also attended the call. As they had done previously Company counsel, Bentivoglio, and CCO Furey pretended not to understand the concerns raised by Ms. Dhaliwal.

166.    Employee merit increases took effect on **December 29, 2014**. In retaliation for her repeatedly raising concerns, the merit increase applied to Ms. Dhaliwal's base salary was inaccurately calculated, so that she would receive less of an increase than she was entitled to receive. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having raised concerns about and having objected to Defendants improper and unlawful conduct internally.

167.    On **January 16, 2015**, Ms. Dhaliwal sent an email to CCO Furey to comply with the Company's request, in which she stated:

Subject: Horizon Slide Deck

"Dear Mr. Furey:

     "I am writing in response to the Company's request that I supplement the concerns that I raised about, among other things, the Horizon Blue Cross Blue Shield of

New Jersey ("Horizon") slide deck that was presented to Horizon on November 6, 2014. As you know, following the Company's presentation, Horizon requested a copy of the slide deck and other information concerning H.P. Acthar® gel ("Acthar"). I forwarded such requests internally and followed up multiple times, but my efforts were ignored. Indeed, after previously raising my concerns to my supervisor and ultimately to the CEOs, you had directed me to cease communications with third parties until further notice. Regrettably, Horizon recently made a change to their medical policy for Acthar, which has a significant impact on the sales of Acthar and such decision is likely directly tied to the Company's refusal to provide Horizon with the information it requested. I previously noted that Horizon is not the only payer who has requested information and has been ignored. The Company's strategy of ignoring customer requests has not only harmed the Company it continues to have a negative affect on my reputation. As those are business relationships that I have developed over numerous years.

Moreover, it stands in stark contrast to the Mallinckrodt Pharmaceuticals Guide to Business Conduct which provides, among other things, *"In all interactions and communications – whether with customers, suppliers, government agencies or others inside or outside the Company – you are expected to be truthful and forthright. This includes:*

- *Making accurate statements, not misrepresentations or statements intended to mislead or misinform; and*
- *Responding promptly, accurately and with full disclosure to requests from governmental agencies for information or documents."*

**Horizon Slide Deck**

In any event, as I explained in our previous meetings, my then-supervisor, Mike Sweeting, provided me with several slide decks in advance of the November 6, 2014 meeting that I had arranged with Horizon. Upon review of the slide decks, some of which I was able to view only via a web-ex, I became concerned about the propriety of various slides and raised such issues with Mr. Sweeting and Mr. Niewoehner.

To my surprise and dismay, many slides were removed when I brought my concerns to Mr. Sweeting's attention. However, after several iterations I received Mr. Sweetings permission to proceed with the presentation, which I was assured had been approved by legal. I did however still have concerns about certain content which I reiterated to Mr. Sweeting and he directed me to proceed.

I supplied several versions of the slide deck to you following our November 26, 2014 meeting at Skadden's office. I understand that the Company has neither concluded its review of such decks nor provided me with a response to the concerns I raised.

My concerns were raised in oral and written communications with several Company employees, including among others, my then-supervisor, Mr. Sweeting, Mr. Niewoehner and yourself. Such concerns can best be summarized by the various categories set forth below. The slide deck included, among other things:

- Slides that were under development and not approved by the Company's legal department;
- Slides that reflected inaccurate payer data;
- Slides that used the term *"orphan-like"* and *"orphan positioned"* to improperly leverage the Company's orphan designation granted by the FDA solely for the treatment of infantile spasms;
- Slides with no references whatsoever or without proper support;
- Slides purporting to depict research and development spending without support or proper reference;
- Slides concerning paid claims that cited *"internal data"* as a source without disclosing it was unreliable reimbursement HUB data, aka *"dirty data;"*
- Slides that referenced *"Questcor Confidential"* as its source; and
- Slides that cited no source other than *"references available upon request."*

The foregoing is not intended to be an exhaustive list and I continue to await copies of the Acthar slide decks which were used during the recent training I attended in St. Louis, Missouri and which were promised to be provided to me upon my return from the training sessions over five weeks ago."

Regards,

Rose"

168.     On **January 16, 2015**, during a telephone call with her then-supervisor, Sr. Director Harris, Ms. Dhaliwal raised concerns regarding potential SEC violations, among other concerns.

For instance, Ms. Dhaliwal stated:

The fact that no one is responding to these accounts [(government and commercial payers)] is highly concerning. Harvard Pilgrim since June or July 2014. BCBS RI… August 28, 2014 and then it just goes on and on from there.

Ms. Dhaliwal communicated to Sr. Director Harris, the responses that she had been directed to provide to payers in the past, as:

(i) talk in circles; (ii) give a non-responsive response; (iii) we don't have the data… make sure you don't say anything; and (iv) tell them we are diligently working on it, when we are not.

Ms. Dhaliwal further stated:

When policy changes happen that are negative and the Company hasn't provided these payers with information that they have requested, these potentially could be material events because they effect the sales of the drug [(Acthar)]. I don't know what the rules are, but they could be material enough where they have to be outlined to the SEC…

Considering these negative policy changes keep happening, its concerning.

169.    On **January 19, 2015,** Ms. Dhaliwal again raised her concerns regarding the

Company's lack of response to Payer inquiries for Acthar, which she said was negatively

affecting business. Ms. Dhaliwal received no response from the Company, other than to further

dismiss her concerns.

170.    On **January 24, 2015**, upon request Ms. Dhaliwal provided additional

information to CCO Furey, concerning Mallinckrodt's unethical and potentially illegal business

activities regarding potential: (i) securities fraud violations, (ii) violations of the False Claims

Act, (iii) violations of the Anti-Kick Back statute, (iv) violation of the Prescription Drug

Marketing Act, (v) fraudulent marketing practices, and (vi) improper use of private patient

medical records, among other things. Further, Ms. Dhaliwal highlighted deficiencies in the

company's compliance processes.

171.    On **January 26, 2015,** after it became apparent that the Company was conducting

a "white wash" investigation of Ms. Dhaliwal's concerns, she sent an email to Mallinckrodt's

CEO Trudeau and Board Member Bailey to inform them of what had transpired since her last

communication on **November 21, 2014**. Along with her email, she attached a 46-page slide deck

presentation titled: "Mallinckrodt Pharmaceuticals Unethical and Potentially Illegal Business

Activities." The presentation was initially created by Ms. Dhaliwal to fulfill one of many requests made to her by CCO Furey.

172.    The aforementioned slide deck was not intended to be an exhaustive list, rather, it's intent was to supplement or reinforce the information that Ms. Dhaliwal had previously provided to CCO Furey in oral and written form.

173.    Said slide deck included information concerning (i) the Company's strategy to stiff arm commercial and government payers i.e. routinely ignore requests for information or provide a evasive response; (ii) the Company's failure to properly preserve documents in connection with Federal investigations and other litigation; and potential (iii) securities fraud; (iv) FCA violations (federal and select states); (v) violation of the AKS; (vi) violation of the Prescription Drug Marketing Act; (vii) fraudulent marketing practices; and (viii) improper use of private patient medical records. Further, Ms. Dhaliwal highlighted deficiencies in the company's compliance processes, as well as certain of the issues surrounding Acthar's dirty data, which as aforesaid may constitute both securities law and FCA violations.

174.    In her email to CEO Trudeau and Board Member, Bailey, Ms. Dhaliwal outlined certain of the retaliatory acts that she has experienced since initially raising her concerns to Messrs Trudeau and Bailey.

The following is a sample of the retaliation she experienced as of **January 26, 2015**, as set forth in her email of that date:

- "Functionally demoted;
- Denied a bonus payment;
- Denied a performance evaluation after having completed the documentation requested by the Company;
- Subjected to hostile and demeaning behavior by my supervisor, Mike Sweeting;

- ▪ Bombarded with an unmanageable amount of work that was accompanied by arbitrary, unrealistic, and unachievable deadlines with the clear intent to undermine my professional proficiency;
- ▪ Numerous administrative errors have occurred, including, but not limited to:
  - o Mistakes in my pay
  - o Personal miles charged $37.60 per mile"

175.    In addition, Ms. Dhaliwal reiterated her concerns with the purported internal investigation and further, urged CEO Trudeau and Board Member Bailey to look into such matter.

Ms. Dhaliwal stated, in pertinent part:

"It is extremely troubling for me to learn that two months have passed and, despite all of the information provided, the investigation seemingly has no traction.  It appears to me that the compliance department is turning a blind eye to the concerns I raised regarding the Company's unethical and potentially illegal business activities.  The Company's mantra – we lack sufficient details to evaluate your claims – is disingenuous at best.  This tactic, which is consistent with the way the Company has dealt with government and commercial payers, is also a serious concern."

"**As you are well aware, if the compliance system is not working properly the exposure for the Company and its shareholders to potential liability is unmitigated.** I urge you to look into this matter." Emphasis added, bolded original.

The retaliation against Ms. Dhaliwal worsened following this email.

176.    On or about **January 28, 2015**, the Company placed Ms. Dhaliwal on what they called "temporary stand down" which meant: (i) not calling on customers – government and commercial Payers – or external entities (since **November 26, 2014**); (ii) not participating in internal meetings and activities; (iii) not attending the Company's National Sales Meeting in Whistler, Canada; and (iv) not reaching out to other Mallinckrodt employees.

The temporary stand down turned into a nine or so months long involuntary stand down, as Ms. Dhaliwal was not restored to her original position following the **February 13, 2015** meeting, which concluded the purported independent internal investigation of her concerns and further, the Company barred Ms. Dhaliwal's access to its systems. This conduct was an intentional

act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having

objected to Defendants and their counsel, Skadden's improper and unlawful conduct internally.

177.    On **February 9, 2015**, after requesting copies of communications regarding Ms.

Dhaliwal's whereabouts during this purported temporary stand down, Company counsel,

Bentivoglio, sent Ms. Dhaliwal's then-counsel, Mandel, the communications included below.

Company counsel, Bentivoglio stated, in pertinent part:

"Attached please find two email communications from Ray Furey regarding Rose's work situation.

The first is an email he sent to Rose's managers regarding the temporary stand down. After he sent this email, Ray placed separate telephone calls to Todd and Vanessa. In those calls, he reiterated the substance of the email, asked Todd and Vanessa not to engage in speculation or further discussion about Rose's situation until they received further guidance, and directed them to let him know of any issues or concerns.

The second is the email he sent to Rose around this same time."

Attachment #1
From: Raymond Furey
Date: January 29, 2015 @ 5:22 PM PST
To: Todd Killian, Vanessa Harris
Cc: Hugh O'Neill, Raymond Furey
Subject: Rose away from work

"Todd and Vanessa,

Rose is taking some time away from work and will return after February 13th. While away from work she will have no contact with customers or external entities, will not be participating in internal meetings and activities, and will not be attending the national sales meeting next week. She will not be reaching out to other Mallinckrodt employees during this temporary period. If necessary, please call me to discuss notification of colleagues or customers regarding this temporary time away from work. Please do not forward this message.

Sincerely,

Ray

Raymond Furey
Senior Vice President and Chief Compliance Officer
Mallinckrodt Pharmaceuticals
26118 Research Road
Hayward, CA 94545"

Attachment #2
From: Raymond Furey
Date: January 30, 2015
To: Rose Dhaliwal
Subject: Re: Fwd: Neuro – Northeast interaction with Market Access Team – Scott Schoenborn

"Rose,

I have notified your team management regarding your status, and additionally have asked them to notify Scott that you won't be attending the meeting or otherwise available until after Feb 13th.

Sincerely,

-Ray"

178.    On **February 10, 2015**, Ms. Dhaliwal transmitted an email to CCO Furey, which

again reiterated that she had raised compliance issues and was the victim of retaliation.

Subject: Retaliation Summary

Ms. Dhaliwal, stated, in pertinent part:

"Further to our several meetings and telephone conversations, an in anticipation of our February 13, 2015 meeting, the following is a brief synopsis of the many ways that I have been retaliated against – both before my November 21, 2014 e-mail to the CEO and Board Member Bailey and after I wrote that e-mail – for continuing to voice my concerns regarding the unethical and potentially illegal, ways that the Company conducted, and continues to conduct, its business. This synopsis is intended to be illustrative, not exhaustive. As we have discussed, virtually from the start of my employment with Mallinckrodt Pharmaceuticals (formerly Questcor Pharmaceuticals), more specifically since August 28, 2014 I observed, among other things, irregularities regarding the data, pricing and sales methodology that was being used by the Company and presented to government payers and potential clients. I made my concerns known to my immediate supervisors (particularly Mike Sweeting – Director, Market Access) and was consistently questioned, in team meetings and during weekly beat downs with Mike Sweeting, the propriety of many of the Company's business practices. My concerns were

not taken seriously and I was immediately labeled a "trouble maker" and berated and belittled by my supervisors. To date, none of my concerns have been addressed. Notwithstanding the Company's written policies about retaliation and harassment, and your verbal assurances that such policies are strictly enforced I have been subjected to a campaign of harassment and retaliation from the inception of time in which I raised my concerns. Notably, I have been demoted and denied an earned 2014 bonus payment – in an attempt to remove me from interacting directly with the effected payers – told not to communicate with third parties or members of my team regarding my concerns, and placed on unexplained administrative leave that has damaged my reputation both inside and outside the organization. Prior to formalizing my complaints, I was retaliated against in various ways, including among others:

1. Mike Sweeting advised me that my questions and concerns were "inappropriate" and refused to provide me any substantive guidance as to how to respond to clients' questions regarding co-pay assistance because it was under scrutiny by the investigators. He consistently yelled at me and ridiculed me regarding my concerns, while failing in a single instance to provide me with concrete answers or direction other than the direction to provide a non-responsive response;

2. In an attempt to intimidate me and scare me into quietly continuing to participate in these business irregularities, Sweeting belittled my efforts and insinuated that I was underperforming with regard to my payer accounts;

3. I was the only one on my team who was provided a Company car with the wrong specifications and, when I complained, the error was blamed on me and I was accused of not following policy and procedure;

4. I was not provided with a formal performance review (this began before I formalized my complaint and continued, uncorrected, after I wrote the November 21st letter);

5. I was assigned an illegal project by Mike Sweeting and Kari Smith – National Director, Market Access on November 24, 2014 related to formulating a consensus statement for H.P. Acthar® ("Acthar") gel to overcome the 'lack of data' issue and the Medicare hurdle that Acthar was "well-established" for the indication/use in clinical practice to increase reimbursement rates for the drug with payers, specifically Medicare.

   Both Mike and Kari directed me to use Dr. Peter Kinkel as the advocate to formulate such statement. Dr. Kinkel was a paid speaker and a high prescriber of Acthar. In addition, Dr. Kinkel would earn further compensation from the Company for his efforts in aiding the Company overcome this challenge with government payers and others. In furtherance, Kari sent me an Allergan document that she had from her prior employment there to serve as the prototype for this project;

6. I was bombarded with unachievable deadlines and unrealistic expectations regarding clients, particularly since I was not provided with any guidance with respect to how to address their realistic concerns regarding potential violations of federal law;

7. I was unable to respond to questions from payers and was told simply to "wait" to get back to them, damaging my reputation because it made me appear unresponsive;

8. I was erroneously placed on "first notice" for not reporting Company car mileage when, in fact, I did submit an accurate mileage report which was also approved by the Company;

9. Sweeting refused to release the Horizon BCBS of NJ ("Horizon") clinical slide deck after I outlined concerns with it. This made it extremely difficult for me to properly prepare for a major meeting with Horizon;
and

10. I received no guidance as to my concerns with the Harvard Pilgrim letter. I was told simply that I did not understand what it was being used for. There has been no response to this payer since May 2014.

Since formalizing my complaint, the major elements of my retaliation claims were outlined in my December 16, 2014 e-mail to you, as well as during our various discussions. However, since raising my claim of retaliation with you, I have been subjected to additional incidents of retaliation, including, but not limited to, the following:

1. Inaccurate paychecks. I was given a 2.7% merit raise at the end of last year, but my paycheck reflects a much smaller amount and a pay period was shortened, which decreased my pay;

2. Subjected me to the entire "mileage" debacle that was objectively unsupportable (I was charged $1,127.92 for 30 miles of personal use and never provided a justifiable rationale for that excessive charge);

3. The fringe mileage issue persists, together with the detrimental tax issues associated with it;

4. Failure to correct my inaccurate 2014 Form W-2;

5. Continued to be bombarded with unrealistic deadlines and expectations, without addressing my now stale concerns regarding the data and sales materials;

6. Given tight deadlines with respect to this investigation and told that there will be "consequences" if I do not comply at the same time as I am supposed to be on

conference calls with my team and my boss aiding in the transition of my national and high profile clients;

7. Given firm immovable deadlines over holiday breaks and weekends;

8. Refused to release the Acthar training slide decks from the Missouri training meeting, as promised;

9. Instructed not to speak with external customers or internal employees further damaging my reputation by again painting me as non-responsive;

10. Not allowed to attend the National Sales Meeting in Whistler, Canada;

11. Not properly explaining my recent administrative leave so that my colleagues are left to guess at why I am absent from work and to speculate that I may have done something wrong or requested time away;

12. Presented on December 19, 2014 (for the first time) with a bonus plan dated October 2014 that contains unachievable objectives, some of which were supposed to have been achieved by the end of December. The objectives of this bonus plan were not even entered in the Company's system until January 30, 2015, any my objectives have never been entered into that system. I cannot possibly achieve any objectives when I am not provided with the tools necessary to do my job and when the Company fails to respond to legitimate concerns raised by payers; and

I trust that this provides you – together with my December 16, 2014 e-mail to you – with a clearer picture of what I have had to endure during my employment with the Company as a result of my raising these very serious concerns."

179.    Notwithstanding that the stated purpose of the **February 13, 2015** meeting (the "**February 13th** Meeting") held at Company counsel, Skadden's NYC office was to share the Company's internal investigation findings, to discuss the steps to be taken to correct Defendants' compliance issues and to seek Ms. Dhaliwal's input, the meeting as it unfolded subjected Ms. Dhaliwal to hours long, harsh, intimidation tactics and aggressive interrogation. Far from being constructive the main purpose of meeting was to further harass, intimidate and retaliate against Ms. Dhaliwal for her having raised concerns about and having objected to Defendants improper and unlawful conduct internally.

52

180.    At the **February 13th** Meeting, it was made clear to Ms. Dhaliwal that CCO

Furey and Company counsel, Bentivoglio were infuriated with her for communicating directly

with CEO Trudeau especially with regard to her **January 26, 2015** email to CEO Trudeau,

which stated, in pertinent part, that "the investigation seemingly has no traction".

181.    The **February 13th** Meeting concluded the internal investigation and to no one's

surprise determined the Company had engaged in no wrongdoing. The investigation's

conclusions further remarked that Ms. Dhaliwal was not placed on paid temporary stand down to

make her feel more comfortable, but rather because she raised these concerns. This conduct was

an intentional act of retaliation against Ms. Dhaliwal.

182.    The Company's internal investigation was nothing more than a white wash

investigation, which sought through intimidation tactics, threats of "consequences" and various

retaliatory efforts to silence Ms. Dhaliwal.

183.    Although, Ms. Dhaliwal was previously informed that she would be restored back

to her original position following the **February 13th** Meeting, this was not the case. Instead, the

Defendants refused to restore her to her original position and further <u>blocked her access to all

Company systems</u> – email, expense reporting system, payroll and benefits, among others – to

which she previously had access. This conduct was an intentional act of retaliation against Ms.

Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants

improper and unlawful conduct internally.

184.    On **March 6, 2015,** Ms. Dhaliwal voluntarily submitted a whistleblower tip to the

SEC Office of the Whistleblower, which included – among other things – accounts of the

Defendants retaliatory acts against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

185.    On **March 24, 2015,** Mallinckrodt offered Ms. Dhaliwal a new position wholly unrelated to the reason she was hired. The Company stated that Ms. Dhaliwal "would be more likely to succeed in this role."  Her then-counsel Mandel, demanded of Company counsel that Ms. Dhaliwal be reinstated to her original position and that Ms. Dhaliwal considered the offer of a different position, which Defendants tied to Ms. Dhaliwal's execution of a release retaliatory. Ms. Dhaliwal remained in lock-down.

186.    On or about, **April 7, 2015,** during her nine or so months long involuntary stand down period, the Company hired Michael Tutera, as the Northeast Corporate Account Director, Market Access ("CAD Tutera"), with responsibility for certain Payers that overlap to the position for which Ms. Dhaliwal was originally hired, resulting in a diminishment of Ms. Dhaliwal's role in the Company. Not coincidently, this diminishment of Ms. Dhaliwal's role occurred at or around the same time that Defendants learned of the DOJs interest in speaking with Ms. Dhaliwal. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally.

187.    On **May 21, 2015**, Ms. Dhaliwal voluntarily met with various government officials and agents from a number of different agencies, in particular, the SEC, DOJ, Federal Bureau Investigation ("FBI") and the U.S. Office of Personnel Management ("OPM") to discuss the business practices of both Questcor and Mallinckrodt with respect to Acthar.

188.     On or about **August 3, 3015**, the Company (by itself and/or through UBS

Financial Services Inc. ("UBS")) oversold shares of Restricted Stock granted to Ms. Dhaliwal to

satisfy a social security wage tax liability due at the time the Restricted Stock shares vest, as

Mallinckrodt had failed to consider that Ms. Dhaliwal had <u>partially</u> satisfied her social security

wage tax liability contribution for the year. This conduct was an intentional act of retaliation

against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to

Defendants' improper and unlawful conduct both internally and to the DOJ.

189.     On **August 4, 2015**, Ms. Dhaliwal again voluntarily met with various government

officials and agents from a number of different agencies, in particular, the SEC, DOJ and FBI to

continue to discuss the business practices of both Questcor and Mallinckrodt with respect to

Acthar.

190.     At least since **August 11, 2015**, as a result of communications between Ms.

Dhaliwal's then-counsel, Foley and Defendants' counsel, communications which were

unauthorized by and unknown to Ms. Dhaliwal, Defendants and their counsel were aware that

Ms. Dhaliwal was speaking with the SEC and other governmental agencies.

191.     Following the conclusion of the internal investigation, the Defendants kept Ms.

Dhaliwal in an involuntary lock-down or solitary confinement – separated from her colleagues

and other employees – for an extended period of time and denied Ms. Dhaliwal's repeated

requests (through her then-counsel, Mandel) to reinstate her back to her <u>original position</u>,

including before, during and immediately after Ms. Dhaliwal met with the SEC, DOJ and other

governmental agencies on **May 21, 2015** and **August 4, 2015**. This conduct was an intentional

act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and

having objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

192. Further, during the involuntary lockdown the Defendants: (1) sold certain of her shares of Company stock upon vesting without her knowledge and, at least in one instance during a black-out period but, in all instances with the knowledge and information concerning the many issues of irregular business practices that she raised; (2) refused to provide her access to all internal systems i.e. expense reporting system, email exchange and payroll, among others; (3) caused her to incur unnecessary legal fees, as she was forced to submit Company expenses for reimbursement through her then-attorney, Mandel; (4) refused and still refuse to reimburse Company expenses owed to her, causing further confusion each time new expenses were submitted and not paid; and (5) caused her to incur unnecessary legal fees to request copies of her pay statements, which Mallinckrodt had refused to provide, among other things. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct.

193. On **September 15, 2015**, the Company (by itself and/or through UBS) failed to consider that Ms. Dhaliwal had fully satisfied her social security wage tax liability for the year and again, oversold shares of Restricted Stock granted to Ms. Dhaliwal to satisfy a purported social security wage tax liability in the amount of $2,675.26, which liability did not exist. Further, the Defendants failed to provide any notice to Ms. Dhaliwal regarding the shares that were improperly oversold, among other things.

194. Rather than refund the excess social security withholding amount to Ms. Dhaliwal, Defendants created a new pay statement and shifted the amount of social security tax

withheld in excess, $2,675.26 into federal withholding and further, failed to provide Ms. Dhaliwal any explanation regarding the same.

195.    These and certain other tax issues regarding the Company's stock, were raised by Ms. Dhaliwal – orally and in writing – on multiple occasions to Mallinckrodt Pharmaceuticals Director, Human Resources Director Angela Woods ("HR Director Woods"), among others, to no avail.  This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

196.    On **September 17, 2015,** Ms. Dhaliwal voluntarily submitted a second FORM TCR to the SEC Office of the Whistleblower, which included a brief narrative on retaliation.

197.    On **September 21, 2015,** Company counsel, Schwartz, sent an email (the "Schwartz Email") outlining terms of a settlement offer and pressured Ms. Dhaliwal to agree in principle to such terms by 4:30PM that day. In connection therewith, the Company demanded <u>a full release of claims, Ms. Dhaliwal's resignation and a Separation Agreement acceptable to the Company.</u>  The Schwartz Email further outlined that Ms. Dhaliwal was expected to return to work the following day, if she did not agree to the Company's proposal.

198.    Later that same day Company counsel, Schwartz withdrew the offer, as the arbitrary 4:30 PM deadline for accepting the Company's offer – which did not disclose the full terms and conditions in a written document – had expired. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

199.     Inexplicably, after placing her on lock down for nine or so months and having denied her repeated requests to be reinstated to her <u>original position and further, having denied her access to the Company's systems,</u> at 7:45 PM on **September 21, 2015**, Ms. Dhaliwal received an email with a letter attached from Mallinckrodt Pharmaceuticals HR Director Woods on her personal Gmail account (the "Mallinckrodt Pharmaceuticals **September 21st** Letter").

200.     The Mallinckrodt Pharmaceuticals **September 21st** Letter directed Ms. Dhaliwal return to work the following day, or the Company would consider her as having resigned from her position. Ms. Dhaliwal complied with such request and returned to work, but she was not reinstated to her original position. She remained functionally demoted.

201.     Further, the Mallinckrodt Pharmaceuticals **September 21st** Letter stated, in pertinent part:

> "This letter constitutes an **unconditional offer** from Mallinckrodt Enterprises, LLC (the "Company") to return to work with the Company as Corporate Account Director Market Access, reporting to Senior Director of Managed Markets & Trade, currently Vanessa Harris. Your territory will be New York **and the Northeast**. You will be responsible for Acthar and you will have the **same payers (or substantially similar payers)** to those you covered at the commencement of your employment." Emphasis added, bolded original.

> "You will continue to be eligible to participate in the Company's group health insurance 401(k) savings plan and other benefits generally available to **Associate Directors** at the Company." Emphasis added, bolded original.

202.     Mallinckrodt Pharmaceuticals is a registered business name for Mallinckrodt plc. Further (i) Mallinckrodt Pharmaceuticals is the plan sponsor for certain, if not all, group benefit plan(s) offered to Company employees, including Ms. Dhaliwal; (ii) the reporting structure of Ms. Dhaliwal's supervisory management chain continued to reflect that of Mallinckrodt Pharmaceuticals, as set forth above in paragraph 15 hereof; (iii) Ms. Dhaliwal was provided

marketing materials for Acthar and other related documents to perform work for the benefit of

Mallinckrodt Pharmaceuticals; and (iv) Ms. Dhaliwal's signature line in her email continued to

represent her employer as Mallinckrodt Pharmaceuticals, among other things.  Although, the

"unconditional" offer represents Ms. Dhaliwal's title as "Corporate Account Director, Market

Access," in reality, Ms. Dhaliwal remained functionally demoted. In addition, Ms. Dhaliwal was

never provided updated business cards to reflect such title or the name of any other corporate

entity besides Mallinckrodt Pharmaceuticals and further, Company counsel, Schwartz, stated in

an email to Ms. Dhaliwal's then-counsel, Mandel, that Ms. Dhaliwal's title would continue to be

Associate Director Market Access. This conduct was an intentional act of retaliation against Ms.

Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants

improper and unlawful compliance and business activities internally and to the SEC, DOJ and

other governmental agencies.

203.    On **September 22, 2015**, Ms. Dhaliwal returned to work. There was a complete

lack of structure surrounding the Company's sudden demand that she return to work: (1) no

schedule or guidance was provided to her by HR Director Woods; (2) no call was scheduled with

her supervisor, Senior Director Harris, to discuss a legitimate plan that would enable Ms.

Dhaliwal to get up to speed and ensure her success; (3) no access to Company systems or valid

passwords were provided upon her sudden return; (4) no time was allotted to review over 1,000

unread emails in her inbox, while continuing to keep up with daily email traffic; and (5) Ms.

Dhaliwal was left to her own devices to figure out how, among other things, to reengage after

being placed on an approximately nine month long lock down period. This conduct was an

intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns

about and having objected to Defendants improper and unlawful compliance and business
activities internally and to the SEC, DOJ and other governmental agencies.

204.    Further, Ms. Dhaliwal was bombarded with an unmanageable amount of work
accompanied by arbitrary, unrealistic and unachievable deadlines.  All of this was calculated to
"manage her out" of a job by falsely portraying her as a poor performer, while applying
maximum pressure to make the hours Ms. Dhaliwal was working coupled with the repeated
abuse and retaliatory acts intolerable. This conduct was an intentional act of retaliation against
Ms. Dhaliwal for her having raised concerns about and having objected to Defendants improper
and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

205.    On **September 23, 2015,** an email from Ms. Dhaliwal's then-counsel, Mandel, to
Company counsel, Schwartz, stated, in pertinent part:

> "David- on Rose's behalf, we made numerous requests for information concerning the
> insurance coverage that exists for the Mallinckrodt/Questcor DOJ and SEC investigations
> in order to submit to the carrier the fees incurred in such matters. To date, she has been
> provided with nothing.
>
> Indeed, having been reinstated after an inexplicable, involuntary nine month stand down,
> during such time the company curiously denied her numerous requests to be restored to
> her original position, today she made a request to the company's HR department for
> information that would provide her with a contact at the company's D&O carrier, but she
> received a non-responsive response. This is unacceptable.
>
> I strongly suggest the company immediately assist Ms. Dhaliwal with respect to her
> rights as a Mallinckrodt employee to obtain coverage for legal fees she incurred as a
> result of governmental investigations concerning Mallinckrodt.
> I await your prompt reply.
>
> Mark"

Defendants and their counsel, Skadden, therefore were aware that Ms. Dhaliwal provided
information to the SEC, DOJ and other governmental agencies.

206.     On **September 23, 2015**, Ms. Dhaliwal sent an email to HR Director Woods that

stated, in pertinent part:

> "As you know, I was abruptly placed on stand down, separated from my Payers and
> colleagues, and barred from the Company's systems after raising compliance concerns
> and continued to be in this stand down mode during such time that I was interviewed by
> the Department of Justice, the Federal Bureau of Investigation, the United States Office
> of Personnel Management, together with the Securities and Exchange Commission."

Defendants therefore were aware that Ms. Dhaliwal provided information to the SEC,

DOJ and other governmental agencies.

207.     On **September 24, 2015,** Ms. Dhaliwal learned that her territory was essentially

only New York and that her Payer accounts had substantially changed. She no longer had

account responsibility for Cigna, Horizon, BCBS RI and Harvard Pilgrim Healthcare – all of the

Payers that she had raised concerns about – along with other Payers located throughout the

Northeast region. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her

having repeatedly raised concerns about and having objected to Defendants improper and

unlawful compliance and business activities internally and to the SEC, DOJ and other

governmental agencies.

208.     On **September 24, 2015,** Ms. Dhaliwal's supervisor, Sr. Director Harris provided

her with a list of her duties and responsibilities that was vague and ill defined, contained

arbitrary and non-attainable deadlines and provided Ms. Dhaliwal with little or no guidance as to

what was required of her to discharge her duties.

209.     The list failed to: (1) specify the numerous other assignments she was required to

complete for a given task; (2) provide any time to review Company records – pay statements,

mileage reports, documents pertaining to the sale of Company stock, and expense reports, among

other things – since regaining access to certain systems, in an effort to further identify and have

the Company correct for all of the administrative errors caused by Mallinckrodt during the nine

or so months long involuntary lock down period; (3) identify the actual number of working days

in her office needed to accomplish the assigned tasks by the due date; (4) identify with clarity all

of the days and locations, she was expected to travel for meetings, while simultaneously trying to

accomplish the assigned tasks; (5) disclose how she was to review the over 1,000 unread emails

in her inbox, while continuing to keep up with daily email traffic, participate in conference calls,

review documents, attend meetings, schedule calls and make travel arrangements, among other

things; (6) disclose the nature and extent of new tasks she would be assigned, as she worked

around the clock to meet the specified deadlines; (7) disclose other meetings she would be

assigned that would require her to travel; and (8) disclose the daunting and frequent intimidation

calls that included two senior executives, such as Sr. Director Harris and HR Director Woods

and Ms. Dhaliwal, which she would be subjected to, among other things. This conduct was an

intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns

about and objected to Defendants improper and unlawful compliance and business activities

internally and to the SEC, DOJ and other governmental agencies, and caused Ms. Dhaliwal to

suffer extreme anxiety attacks for which she required and continues to seek medical attention.

210.    On **September 25, 2015**, Ms. Dhaliwal replied to Sr. Director Harris's

**September 24th** email and copied Mallinckrodt Pharmaceuticals VP Killian, as he was included

in the original email.

Subject: RE: Summary and timeline of job responsibilities

"Hi Vanessa,

Thank you for your email. I very much look forward to reintegrating after 9-months or so of an abrupt involuntary "stand down" in which the Company separated me from my Payers and colleagues, and barred me from the Company's systems after I raised compliance concerns and continued to be in this stand down mode during such time that I was interviewed by the Department of Justice, the Federal Bureau of Investigation, the United States Office of Personnel Management, together with the Securities and Exchange Commission.

As you know I was reinstated into my current position on 12-hours notice and returned on Tuesday, September 22, 2015 without access to all of the Company's systems. My attorney and I both reached out to the Company and its counsel in order to obtain passwords and have the necessary IT applications installed on my laptop to regain access, as the Company did not provide me with valid passwords nor take care of the IT related issues in advance.

While I am eager to fulfill all of my duties I will require a reasonable amount of time to get up to speed before I am able to do so. Although you had stated during our brief September 22, 2015 call that it was not necessary to go through my emails, I do not understand how I could avoid doing so as its part of the process of getting up to speed. In addition, other Company employees are provided the opportunity to review their email communication on a daily basis. Since the Company barred me from all systems, I was not allowed to do so.

In so far as the 2015 performance evaluation is concerned, I was barred from the system and not allowed to enter my goals for FY 2015. Putting aside the short deadline of one-day you allotted me to submit the 2015 performance evaluation, I was in an involuntary stand down mode for nearly the entire year. Thus, this request appears unreasonable and unachievable.

With respect to my 30-working day action plan, or longer, it would consist of: (1) reviewing nine or so months of emails; (2) speaking with my colleagues, including Scott Schoenborn and Mike Tutera; (3) ensuring I have access to all IT systems; (4) following up on various administrative errors with my pay, expense reports, mileage reports and tax issues, among other things, the Company needs to correct; (5) ensuring I have the necessary information to perform my job function i.e. approved slide decks for Acthar, Acthar's price increase history, Acthar's current WAC and AWP, Acthar's national and regional coverage, Acthar's product monograph or dossier and information pertaining to any MCO/PBM contracts for Acthar, among other things; and (6) completing the training for Qlikview. Since your email was sent on September 24, 2015, I'm unable to review this action plan with you by September 23, 2015. I'm happy to discuss what I've laid out with you today.

With regards to the other items listed in your email below, I have captured my comments

in bullet point fashion below:

- QlikView training – Please have someone install the application on my desktop, so I can complete my training on 9/28

- Complete compliance wire training, week of 9/28 – It is my understanding that my colleagues were given from August 17, 2015 until September 25th to complete one compliance task and additional time to complete the other tasks. To the extent there are any overdue assignments, it would be due to the fact that I was cooperating with the Company's internal investigation of my compliance concerns or the Company barred me from all systems. In light of the forgoing the timeline needs to be adjusted to accommodate the various tasks that are on my plate

- With respect to the Market Access compliance training, could you please clarify what this entails? Thank you

- Everyday Coaching and Conversations training, week of 9/28 – My understanding is that my colleagues were given approximately five or so weeks to complete this training. Thus, this timeline needs to be adjusted

- Expense training webinar – I'm not sure which expense report system this refers to. I understand the Company is switching from Infor to Concur in October. Thus, please clarify and provide information as to how and where I sign-up for the training. Thank you.

- Refresh of the Acthar Medical Model Policy review, schedule week of 9/28 – Would you kindly send me an electronic version of Acthar's Medical Model Policy. In light of my previously stated obligations to get up to speed, we need to adjust the timeline

- Acthar PVP, real world application and training, schedule week of 9/28 – Please clarify what this is and the timeline needs to be adjusted

- 2016 SCIP plan and MBOs, review by 10/2 with Vanessa – The Company needs to adjust its 2016 SCIP plan and MBO's to accommodate me given the fact that Mallinckrodt placed me in an abrupt involuntary 9-month or so "stand down," barred me from its systems and separated me from my Payers and colleagues, among other things. Applying a neutral employment policy would have a disproportionate negative effect on me, given that my colleagues were not treated in the same manner

- Review meeting notes and coordinate with Scott Schoenborn and Mike Tutera to begin participation and integration, by 10/30 – Included in my 30 working day plan

- Review reimbursement mapping with Scott Schoenborn and Mike Tutera, by 10/30 – Included in my 30 working day plan

64

Case 1:18-cv-03146   Document 1   Filed 04/10/18   Page 65 of 104

- Begin collaboration with RRMs/RMs to coordinate discussions of local account reimbursement issues, by 10/30 – This timeline would need to be adjusted, as I need reasonable time to get up to speed

- Development of Payer scorecards for top 5 accounts, by 10/30 – This timeline would need to be adjusted, as I need reasonable time to get up to speed

- Transfer of assigned accounts back to Rose by interim CAD, by 10/30 – I look forward to the transition, but I will require a reasonable amount of time to get up to speed and accomplish this task

- Develop an action plan for assigned accounts, introductory meeting and PVP plus scientific exchange meetings, by 10/30 – With respect to my accounts and an action plan the time of 26 working days to accomplish such task needs to be adjusted, given the extensive check list to get up to speed

I look forward to getting up to speed, reintegrating with the Payers and my colleagues and tackling the check list.

Regards,

Rose"

Defendants therefore were aware that Ms. Dhaliwal provided information to the SEC, DOJ and other governmental agencies.

211.    On **September 25, 2015**, during a call with Senior Director Harris and VP Killian, Ms. Dhaliwal was told to "comply" with arbitrary, unrealistic and unachievable deadlines and criteria.  Deadlines and criteria that differed from the time allotted to other employees for the same tasks.  It was made clear to her that the lack of compliance to such instruction would have consequences. This conduct was an intentional act of retaliation against Ms. Dhaliwal for having repeatedly raised concerns internally and to the SEC, DOJ and other governmental agencies regarding the Defendants improper and unlawful compliance and business practices.

65

212.     On Friday, **September 25, 2015** @ 11:26PM, Ms. Dhaliwal sent an email to Sr. Director Harris and VP Killian.

Subject:  FY 2015 Year-End Performance Self-Evaluation

"Todd and Vanessa,

In an effort to comply with your stated one-day deadline specified in the September 24th email and re-confirmed during today's call, I attempted to complete a year-end performance self-evaluation in Workday for the time period October 2014 – January 2015. Such task is unachievable.

- November 26, 2014 – The Company directed me to stop speaking with external customers

- December 18, 2014 – First time I was provided draft goals and an SICP plan for FY 2015 (October 2014 – September 2015)

- January 28, 2015 – The Company placed me in an abrupt involuntary full "stand down" mode

- No goals for FY 2015 exist in Workday, as the Company barred me from all systems

- As stated by the Company "The goal setting process is a collaboration between you and your manager **to define what you are expected to accomplish throughout the year."**

  It is impossible to accomplish goals that are unknown to the employee. Such goals were never finalized, nor approved by Vanessa as they do not exist in Workday. Furthermore, it is impossible to accomplish business results when I was involuntarily barred from speaking with customers for nearly the entire year and eventually internal employees and barred from all Company systems.

- Since I was barred from all systems, the Company did not afford me the same training opportunities as other employees. In fact, in an email dated August 20, 2015 "Leadership Message – Performance Management" MNK HR stated: "[…] More information about each element of the performance management process will be available in the upcoming weeks, **including upcoming training opportunities and tools to help you complete the process.** In the meantime, to help you prepare, we have outlined a few important details below. […] **September 14-25: Employees complete self-evaluations in Workday** […]"

66

Clearly, you did not think that the same timing and training opportunities could be extended to me, as exemplified by the timeline included in your September 24th email and further confirmed during today's 2PM conference call. It is evident that I was treated differently than other employees, as the time I was allotted to complete the self-evaluation was one day.

Although I had repeatedly requested to be reinstated to the position for which I was hired, the Company refused to do so for 9 or so months. During my absence the Company hired Michael Tutera, as the Northeast Corporate Account Director – Market Access, with responsibility for certain Payers that overlap to the position for which I was originally hired. In addition, the Company shifted certain of my Payers to another one of my colleagues who lacked the long-standing relationships that I had developed with such Payers over the years.

Inexplicably, after placing me on stand down for 9 or so months, on September 21, 2015 the Company directed me to return to active status on 12-hours notice. The Company assured me I would be returning to the position for which I was originally hired, but such representation was false. I have been functionally demoted, as I am now responsible for covering <u>only</u> regional, as opposed to national and significant regional Payers throughout the Northeast region and even those accounts have been substantially downgraded.

I believe the two of you and the Company have violated both federal and state employment laws by further retaliating against me because of my complaining about certain of the Company's practices. Today, I was told to "comply" to arbitrary, unreasonable, and unachievable deadlines. Deadlines and criteria that differ from the time expected from other employees for the same tasks. Further, I was told not to question my supervisor.

Such language and approach is unacceptable in any organization, let alone a team of professionals. Todd, you made it very clear how the lack of "compliance" to such instruction would have consequences.

-Rose"

This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having

repeatedly raised concerns about and having objected to Defendants improper and unlawful

compliance and business activities internally and to the SEC, DOJ and other governmental

agencies.

213.     Despite the fact that Ms. Dhaliwal had already attempted to complete a self-evaluation to comply with Defendants demand and had repeatedly raised concerns regarding Defendants conduct, which made it impossible for her to meet said demand, on **September 29, 2015**, Mallinckrodt Pharmaceuticals HR Manager, Val Brinker ("HR Manager Brinker") sent Ms. Dhaliwal an email with a copy to her supervisor, Sr. Director Harris, which completely ignored her concerns and not only characterized Ms. Dhaliwal's self-evaluation as "overdue," but directed her to make it a "priority" to complete her self-evaluation. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful compliance and business activities internally and to the SEC, DOJ and other governmental agencies.

214.     On **September 29, 2015**, Ms. Dhaliwal replied to HR Manager Brinker's email and included Sr. Director Harris in her response, which stated:

"Hi Val,

I previously responded to Todd and Vanessa's request that I complete a self-evaluation in Workday. As I explained to them, I do not believe it is possible in light of the fact that the Company placed me in an abrupt involuntary full "stand down" mode for 9 or so months – prior to which I was directed not to speak with external customers – and the Company barred me from all systems. As a consequence, no goals were ever entered into Workday and, in light of my stand down status, they would have been impossible to achieve.

Moreover, since I was barred from all systems, the Company did not afford me the same training opportunities and tools afforded to other employees to help complete this process.
Thus, I am more than happy to submit a self-evaluation form, but I do not see how that would be possible. I welcome any guidance.

Regards,

Rose"

215.    On **September 29, 2015**, Ms. Dhaliwal attended a telephone meeting with

Mallinckrodt Pharmaceuticals Analyst Data Modeling, Natasha Terhardt ("Analyst Terhardt")

concerning, among other things, Acthar's data. While reviewing various reports for Acthar with

Analyst Terhardt, Ms. Dhaliwal inquired how the Company determined "projected vials" for

Acthar. In response, Analyst Terhardt, stated,

> "so projected vials, we make projections based on information we have about paid
> referrals. Again, as far as I know <u>we do not have information on all accounts</u>, but on
> those who go through, if I remember correctly, Accredo, we have this information. So,
> based on treatment algorithm or diagnosis and patient type there is a formula and David
> [Okimoto] is <u>still working on this how to make it more accurate</u>, so we project vials
> because we know that one referral in a, for a certain therapeutic area or disease can
> generate vials in let's say current month or prospective month." Emphasis added.

Following this lengthy discussion, it was apparent to Ms. Dhaliwal that the issues

surrounding Acthar's dirty data continued to persist.

216.    On **September 30, 2015**, Ms. Dhaliwal sent an email to her supervisor, Sr.

Director Harris, requesting, among other things, Acthar's current WAC, AWP and Acthar's price

increase history, since the 2% increase on **December 16, 2014**, in an effort to get up to speed.

217.    Rather than provide Ms. Dhaliwal the requested information, on **October 1, 2015**,

Sr. Director Harris, replied, in pertinent part:

> "Please schedule time on Bill Hillmer's calendar, Sr. Director of Pricing and Contracting
> Strategy and Trade. He will be happy to go over our pricing and contracting strategy and
> any other questions you may have."

> "This topic will be covered by Bill Hillmer during your meeting with him."

218.    Ms. Dhaliwal complied with Sr. Director Harris's direction. She exchanged

various email communications with Sr. Director Strategic Pricing & Contracts, William J.

Hillmer ("Sr. Director Hillmer") to schedule time on his calendar.

219.    On or about **October 5, 2015**, Ms. Dhaliwal's then-colleague, Director Dewitt,

informed her that their mutual supervisor, Sr. Director Harris, had removed her from the

distribution list on certain email threads, but not others. For instance, on **October 5, 2015**,

Director Dewitt, had forward an email to Ms. Dhaliwal dated **June 8, 2015** (the "**June 8th**

Email"), which email was distributed by Senior Director Harris to members of her team, yet,

strangely excluded Ms. Dhaliwal.

220.    Sr. Director Harris's **June 8th** Email included certain of the information Ms.

Dhaliwal had specifically requested from her supervisor on **September 30, 2015**. Rather than

provide Ms. Dhaliwal the **June 8th** Email, Sr. Director Harris continued to overload her daily

activities by directing her to schedule calls with various individuals (and causing Ms. Dhaliwal

to send email after email) to obtain the information Sr. Director Harris was fully able to provide

to Ms. Dhaliwal.

The **June 8th** Email stated, in pertinent part:

Subject: Acthar Pricing Action
To: Dewitt, Nate; Harris, Vanessa; Kelly, Shannon M; Schoenborn, Scott; Telder, Rick;
Tutera, Michael D; Woodworth, Krista

"Team,

I would like to inform you of Acthar's price action. Following is a short summary of the
action:

- Effective date June 4th
- Revised price $34,034
- The price change reflects an increase of 5.5% (from $32,260 to $34,034)
- The previous increase was 2.0% in December 2014

The pricing compendium have been notified and their systems should soon reflect the
revised price.

I would not be proactive in sharing the price increase, percent increase, date of last increase, etc. unless asked by an account. Please do not forward this email to your accounts.

Call if you would like to discuss.

Vanessa Harris, RN"

This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful compliance and business activities internally and to the SEC, DOJ and other governmental agencies.

221.   After receiving an email from Director Dewitt, on **October 5, 2015**, Ms. Dhaliwal had asked Sr. Director, Market Access Marketing Debra Hasse ("Sr. Director Hasse"), if she was aware of Acthar's AWP (not WAC, as Ms. Dhaliwal had already obtained it from her colleague). At 10:19 PM that same evening, Ms. Dhaliwal received an email from Sr. Director Hillmer with Acthar's WAC and again, no AWP.

222.   On **October 6, 2015**, Ms. Dhaliwal replied to an email from Director Program Administration, Sandi Shaffer ("Director Shaffer").

Subject: RE: TIME SENSITIVE: Outstanding Credit Card Charges in Infor

"Hi Sandra and Angie,

I don't understand what the difficulty is here with respect to my expenses. When I was placed on an involuntary stand down the Company prescribed the manner in which I was to submit my expenses. I was directed to have my lawyer submit my expenses to the Company's counsel. We did it and we provided all receipts and appropriate detail to make it fool proof. Despite our efforts the Company mangled my expenses because reimbursements were not promptly made, made in the wrong amounts, not made at all and/or assigned such reimbursement to the wrong account (i.e. Company credit card or employee).

As a result, it is incumbent upon the Company to correct these errors as I am unable to process my expenses on the system as it would perpetuate the issues that exists. I encourage the Company to obtain from Mr. Schwartz my expense reports, accompanying receipts and all communication with respect to these submissions, so the expense issue can be corrected which would allow me to use the Company credit card which is currently shut off for lack of payment and being over the limit.

This issue has impeded my ability to perform my duties and obligations, including registering for conferences and paying my monthly garage, among other things. I have wasted a lot of time and effort going back and forth on this issue. I still can't retrieve my car from the garage because I am unable to pay my garage expense due to such issue. I would appreciate it if the Company would correct this immediately.

Thank you,

Rose"

The Company's failure to cooperate to correct the errors in the payment of expenses was intentional and in retaliation for Ms. Dhaliwal her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

223.    On **October 7, 2015**, Ms. Dhaliwal attended a Company meeting in Princeton, New Jersey. During a break, she spoke with Corporate Account Director Shannon Diantonio ("CAD Diantonio") with respect to the reimbursement hub and Acthar's limited distribution network, among other things. During such conversation, CAD Diantonio, among other things, stated that the reimbursement hub data was not coming from the specialty pharmacy's and was not reliable nor accurate data.

224.    On **October 22, 2015**, Corporate Account Director, Market Access Scott Schoenborn ("CAD Schoenborn") sent his notes concerning an **August 27, 2015** meeting with Capital District Physicians Health Plan ("CDPHP") to Ms. Dhaliwal *via* email, as account

responsibility for CDPHP was transitioning over to Ms. Dhaliwal. CDPHP is a regional payer located in Albany, New York.

225.    CAD Schoenborn's notes illustrate yet another payer that has alleged the Company is engaged in unethical business practices to generate prescriptions for Acthar and further demonstrates the frustrations most payers have with Acthar's price, among other things. CDPHP restricted Acthar's reimbursement coverage to IS only.

226.    For instance, CAD Schoenborn's notes, state, in pertinent part:

"**Burden to Plan** – CDPHP claims they receive an average of 2 AG [Acthar] referrals per day. They cited that these unwarranted requests incur a financial impact and resource burden on the plan. These referrals waste the time of Staff, providers, and patients."

"**Field Force Behaviors** – There's an increasing rate of unsubstantiated referrals being generated by providers. Most submissions are not substantiated with adequate data or trials on alternative medications. **<u>Accused field force of using unethical practices to generate prescriptions.</u>** Propaganda was the word used by CDPHP. They questioned the legitimacy of the sales force incentive system developed for the Mallinckrodt." Emphasis added, bolded and underlined original.

"**Price** – Reduce the price is the only answer. Why did the price go from $400 to $40,000 per vial?"

"**Financial** – Flat out no interest in Rebates. CDPHP does not want to use the product because they do not want Pharma to have a role in crafting Medical policy."

Serious accusations of unethical practices to generate prescriptions for Acthar warranted a response from Mallinckrodt's legal counsel or CCO Furey soon after the **August 27, 2015** meeting with CDPHP, but none was provided.

227.    On **October 22, 2015**, Ms. Dhaliwal sent an email to Senior Director Hasse, inquiring about Acthar's product monograph. Sr. Director Hasse's response indicated Acthar's product monograph would not be ready until late **January/February 2016**.

As a follow-up, Ms. Dhaliwal, stated, in pertinent part:

"Thank you for your response. I have a concern.

The Acthar Payer objection handler dated March 16, 2015, states:

Objection: "Please show me the data used in the 2010 submission"

Response: "Our product monograph contains all the relevant clinical data that was used in the 2010 submission plus additional data"

Given the Company does not have an approved product monograph to share with a Payer, if requested, this response is a concern. I wanted to bring this to your attention."

In response, Sr. Director, Hasse, stated, in pertinent part:

"I will track down if there is an approved Monograph. I know at one time Kari said one was developed, but it was not in her archives when she left the company.

We have not been requested to provide this information to date. I am sure that we have documentation, but we will need to work to find it."

Sr. Director, Hasse's response was alarming and prompted Ms. Dhaliwal to raise further concerns, as she stated, in pertinent part:

"Thank you for your response. However, this is highly concerning, as BCBS of RI requested this data in 2014. None was provided.

I was also told throughout 2014, no approved Monograph existed.

Moreover, it is of great concern that we are directed to respond to an objection from commercial and government Payers in the manner described below, without knowing if an approved Monograph which "contains all of the relevant clinical data that was used in the 2010 submission plus additional data" even exists.

I greatly appreciate your attention to this concern."

In response, Sr. Director, Hasse, stated, in pertinent part:

"I have reached out to the ARC team to obtain from the archives. Will share once received."

Ms. Dhaliwal never heard back.

74

228.    Although, the purported internal investigation conducted by Company counsel,

Bentivoglio and CCO Furey concluded that there had been no wrong doing by the Defendants,

internal communications, documents and discussions with Company personnel in which Ms.

Dhaliwal participated continued to demonstrate otherwise, indicating that the internal

investigation had been nothing more than a whitewash.

229.    To illustrate, the issues surrounding Acthar's claims data continued to be flagged

by others within the Company. On **October 23, 2015**, CAD Tutera distributed an account

analysis for Highmark BCBS *via* email. CAD Tutera, stated, in pertinent part:

> "Can't appropriately comment on this slide. We are experiencing a data capturing issue
> with Qlikview in Highmark Med D. For Example, Qlikview Highmark Med D utilization
> shows 1 in NEPH for Q215, however, Highmark's sent us actual Q215 Med D data and it
> showed 25 PD/SH. Additionally, Qlikview isn't showing any data for Q3, whereas HM is
> showing data."

230.    On **October 23, 2015**, Ms. Dhaliwal reached out to Sr. Director Hillmer *via* email

to follow-up on a discussion regarding Acthar's AWP.

Subject: RE: Follow-up

Ms. Dhaliwal, stated, in pertinent part:

> "With respect to AWP, there are still quite a number of states that utilize a drug product's
> AWP as the bases for Medicaid reimbursement. I have attached the 'Medicaid Covered
> Outpatient Prescription Drug Reimbursement Information by State, Quarter ending June
> 2015,' as its's a great reference document to keep up with the ever changing
> methodologies used by each state to determine reimbursement.

> One of my accounts is New York State Medicaid. The method NY utilizes to determine
> reimbursement is AWP minus 17%.

> Certain Payers, such as Horizon BCBS of NJ actually require that manufacturer provide
> them with an AWP (see attached guidelines, page 2). Thus, **if a Payer asks me for
> Acthar's AWP during a meeting, what should my response be? The Company is not
> aware of Acthar's AWP, nor can I provide you with a referenced AWP by a**

**publisher. Your guidance on how to handle such response would be greatly appreciated.** Thank you." Emphasis added, bolded original.

In response, Sr. Director, Hillmer, stated, in pertinent part:

"I understand that some states still use AWP. However, we as a company to now determine what AWP is or have anything to do with its calculation. We provide the WAC to the pricing compendium (First Data Bank, etc.). They may publish an AWP but I do not know how they calculate this number. I can say that in the past, the AWP was generally WAC times 1.2 or 1.25. If we are required to submit a form to a state Medicaid and they ask for the AWP, we would generally either leave it blank and explain that we do not offer an AWP."

231.    On **October 30, 2015**, Ms. Dhaliwal sent an email to Sr. Director Harris, which

stated, in pertinent part:

"Hi Vanessa,

My lawyer has been in discussions with Company counsel. While those discussions are ongoing it was agreed that I stand down from the Florida and Arizona meetings, etc. I was unaware this information was not conveyed to you.

-Rose"

This was part and parcel of a rumor started by management that Ms. Dhaliwal was about

to be terminated, designed to cause her additional stress and undermine her effectiveness, in

retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having

objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and

other governmental agencies.

232.    On **October 31, 2015**, Company counsel, Schwartz, transmitted a Separation of

Employment Agreement and General Release, that included terms and conditions which were

unconscionable and further, unlawful. By way of example only:

The Confidentiality provision, stated, in pertinent part:

"Accordingly, Employee agrees to pay the Company and its Releasees, as liquidated damages, $250,000 for each violation of this section."

Further, the agreement required that Ms. Dhaliwal must provide <u>reasonable advance notice</u> to the Company prior to:

"filing, testifying, participating in or otherwise assisting in a proceeding relating to an alleged violation of any federal, state or municipal law relating to fraud, or any rule or regulation of the Securities and Exchange Commission or any self-regulatory organization."

233.    In a letter dated **March 23, 2018**, Company counsel, Schwartz, stated, in pertinent part:

"[t]he Company expected to have a separation agreement finalized by the end of the following week [(November 6, 2015)]."

The Company's demand was not only unreasonable, it was unconscionable and most certainly in violation of Rule 21F-17 pursuant to the Securities and Exchange Act of 1934, as amended. The terms of the **October 31, 2015** agreement demonstrate further retaliatory acts by Defendants against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies. These terms also demonstrate Defendants and their counsel, Skadden's knowledge of Ms. Dhaliwal having reported her concerns to the SEC, DOJ and other governmental agencies, as such terms are intended to muzzle a whistleblower.

234.    On **November 1, 2015,** an internal Foley & Lardner LLP ("Foley") email, stated, in pertinent part:

"Subject: RE: Rose Dhaliwal"

"I will review more closely but this has us only getting $150,000. I thought we were getting $300,000? Obviously, this is the biggest and by far the most important issue."

This raises serious ethical concerns relating to Foley's business relationship with the Company, and the Company's willingness to exploit that relationship at the same time that Foley was representing Ms. Dhaliwal.

235.    On or about **November 27, 2015**, FY 2015 bonus payments were provided to Ms. Dhaliwal's colleagues, and not to her. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful compliance and business activities both internally and to the SEC, DOJ and other governmental agencies.

236.    On or about **December 16, 2015**, Ms. Dhaliwal (through her then-counsel, Foley) raised concerns to Company counsel, Schwartz regarding the Company's failure to pay her **FY 2015** bonus when paid to other similarly-situated employees on **November 27, 2015**. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

237.    In or around **December 2015**, Ms. Dhaliwal again lost access to Mallinckrodt's Workday system, as an error message appeared in its place. Thus, she was unable to retrieve her pay statements, among other essential employee information through normal channels. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

238.    On or about **December 24, 2015**, the Company materially decreased Ms. Dhaliwal's net pay by over $3,000.00 for pay period end **December 27, 2015**. Since Ms.

Dhaliwal was unable to access her pay statement's through Mallinckrodt's Workday system, the cause remained unknown. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

239.    On **January 11, 2015**, Ms. Dhaliwal (through her then-counsel, Mandel) raised concerns to Company counsel, Schwartz regarding: (i) her inability to access Mallinckrodt's Workday system, as an error message appears in its place; (ii) the Company materially decreased her net pay of over $3,000.00 for pay period end **December 27, 2015**. Since she was unable to access her pay statements, the cause remained unknown. The Company's failure to respond to a previous request for information concerning such decrease and further, requested several of Ms. Dhaliwal's pay statements, a detailed explanation of the cause of such decrease and all relevant data and calculations necessary to understand the pay discrepancy; and (iii) the Company's failure to pay Ms. Dhaliwal's FY 2015 bonus, despite the representations by Company counsel, Schwartz to Ms. Dhaliwal's then-counsel, Mandel that her $50,000.00 bonus payment for FY 2015 would be paid in **December 2015** or no later than the first pay period in **January 2016 [pay period end, January 10, 2016]**, the Defendants continued to withhold said bonus payment. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful compliance and business activities both internally and to the SEC, DOJ and other governmental agencies.

240.    On **January 12, 2016**, Ms. Dhaliwal's then-counsel, Mandel, again asked Company counsel, Schwartz, for an explanation concerning the mileage expense and copies of

her last 5 pay statements, as the Company refused to restore her access to Mallinckrodt's Workday system.

241.    At the direction of Company counsel, Schwartz, on **January 13, 2015**, Ms. Dhaliwal reached out to Mallinckrodt's IT helpline. She granted the Company's IT personnel remote access to her company laptop to restore her ability to enter such system; however, she became increasingly concerned during the process (as the word "deleted" appeared on her screen a number of times) with respect to the preservation of files contained on her laptop. Subsequent to this "temporary" fix, Ms. Dhaliwal continued to encounter access issues with the Company's Workday system. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

242.    On **January 13, 2015**, Company counsel, Schwartz, provided Ms. Dhaliwal a work-around to access Mallinckrodt's WorkDay system. This was not pursuant to normal business practice, since she should have unfettered access to Defendant's business systems. Further, Company counsel, Schwartz, again represented that Ms. Dhaliwal would receive a bonus payment of $50,000.00 less withholdings on **January 22, 2015**. The lack of access to Mallinckrodt's Workday system through normal channels and further, the Defendants continued failure to pay Ms. Dhaliwal's FY 2015 bonus payment since **November 27, 2014** were intentional acts of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

243.    Despite the representations by Company counsel, Schwartz to Ms. Dhaliwal's then-counsel-Mandel that her $50,000.00 bonus payment for FY 2015 would be paid in **December 2015** or no later than the first pay period in **January 2016** [pay period end, **January 10, 2016**], the Defendants continued to withhold Ms. Dhaliwal's FY 2015 bonus payment. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

244.    On **January 18, 2016,** Ms. Dhaliwal sent a letter to the SEC Office of the Whistleblower further objecting to the retaliation. Following this correspondence, the retaliatory acts against Ms. Dhaliwal by the Defendants intensified.

245.    On **January 20, 2016**, Company counsel, Schwartz, provided a Microsoft Excel file that outlined the data Mallinckrodt used to determine Ms. Dhaliwal's fringe mileage charge – which decreased her net pay by over $3,000.00 in **December 2015** – along with the Company's Fleet Vehicle Policies and Procedures.

246.    The Company's data included in said Microsoft Excel file represents a total taxable amount of $7,270.73, yet Ms. Dhaliwal's pay statement reflected a higher amount, $7,312.50. Furthermore, the reported mileage in the Company's document reflected that Ms. Dhaliwal drove two (2) business miles and eighteen (18) personal miles, which was inaccurate.

247.    Notwithstanding the absurdity of equating approximately $403.93 per mile as taxable wages to an employee for personal use of a Company vehicle, Mallinckrodt asserted that that is its policy. The Company imputed $7,312.50 to Ms. Dhaliwal as taxable wages for barely driving the Company's leased vehicle any personal miles throughout the year and further, Ms.

81

Dhaliwal did not drive the Company vehicle during the nine or so months long involuntary lock down period. As a consequence, her net pay decreased by over $3,000.00 for pay period end **December 27, 2015.** This conduct further demonstrates the blatant retaliatory acts against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

248.     Nearly two months late, on **January 22, 2016**, the Company paid Ms. Dhaliwal's FY **2015** bonus payment in the amount of $46,875.00, however, Ms. Dhaliwal received less than the $50,000.00 gross amount in bonus pay represented by Company counsel, Schwartz, to Ms. Dhaliwal's then-counsel, Foley. Further, the Defendants failure to pay Ms. Dhaliwal's FY **2015** bonus payment on **November 27, 2015** when said bonus was due caused Ms. Dhaliwal to pay $2,906.25 in social security tax, which social security wage tax liability was otherwise fully satisfied had the bonus been paid to Ms. Dhaliwal on **November 27, 2015**. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

249.     Further, Mallinckrodt has also created and failed to remedy the issues with respect to the payment of local taxes, among other tax related issues. For instance, the Company failed to withhold New York City ("NYC") tax in connection with Ms. Dhaliwal's regular and supplemental wages throughout her employment and likely, includes the deposit to her Wells Fargo account by Mallinckrodt subsequent to her retaliatory discharge on **March 26, 2018**, which deposit the Defendants have failed to provide her a pay statement to date.

250.    Notably, on October 11, 1991, the New York State Department of Taxation and Finance Taxpayer Services Division issued guidance (the "Guidance Document") to enable employers "[t]o correct certain withholding tax problems identified by the Department's audit staff and thus avoid the imposition of penalties and interest for failure to properly comply with the withholding tax rules."

The Guidance Document states, in pertinent part:

"Section 671 of the New York State Tax Law provides that every employer maintaining an office or transacting business in New York State and making payment of any wages subject to New York State personal income tax must deduct and withhold tax from those wages."

"Section 675 of the Tax Law provides that every employer required to deduct and withhold is made liable for the tax, including any additions to tax, penalties or interest with respect to the tax."

"**The preceding requirements also apply for purposes of the New York City** and Yonkers **personal income taxes** and nonresident earnings taxes." Emphasis added, bolded original.

It is an indisputable fact that the Company is aware that Ms. Dhaliwal is a resident of New York City, which is reflected in her address on file with the Defendants.

251.    Despite Ms. Dhaliwal's attempts to remedy the issues with the payment of local taxes with the Company and its counsel, among other issues, in a letter, dated **August 31, 2016**, Company counsel, Schwartz, denied that any issues existed and indicated that the Company reiterated its positions on the issues, including the payment of local taxes, and stated, in pertinent part,

"On **January 22, 2016**, the Company responded to Ms. Dhaliwal's counsel that the tax withholding totals 46.52% with respect to the amount received by Ms. Dhaliwal for the 2015 bonus."

Counsel for Mallinckrodt even admitted that the Company failed to withhold local taxes in an email dated **January 22, 2016** (referenced above), which stated, in pertinent part,

> "With respect to taxes, I have noted below my understanding of the tax withholding rates applicable to bonus payments. They total 46.52%. You should certainly double check for yourselves though.
> Federal – 25%
> State – 9.62%
> NYC – 4.25%
> FICA – 6.2%
> FUTA – 1.45%"

The Company's continued failure to withhold NYC tax from Ms. Dhaliwal's regular and supplemental wages in **2014**, **2015**, **2016**, **2017** and **2018** and further, its failure to remedy the plethora of tax issues the Defendants caused were intentional acts of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to the Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

252.    On **February 16, 2016**, a document (the "**February 16th** Document") was transmitted to Company counsel, Schwartz, in which Ms. Dhaliwal raised additional concerns, in that communication she alerted Company counsel, Schwartz to the fact that the Company's draft Separation of Employment and General Release Agreement (the "Agreement") included improper language and/or provisions in violation of Rule 21F-17 pursuant to the Securities and Exchange Act of 1934, as amended, and did not comport with rulings and orders of the SEC, among other things.

253.    In particular, Ms. Dhaliwal, stated:

"The language inserted throughout the Agreement with respect to the SEC is: (1) improper, refer to SEC Rule 21F-17; (2) offensive; and (3) retaliatory
Reference to case law, included in the links below
https://www.sec.gov/news /pressrelease/2015-54.html

https://www.sec.gov/News/PressRelease/Detail/PressRelease/1370542096307"

"The Company's pre-notification requirement with respect to the SEC is contrary to prevailing law

Reference to case law, included in the link below:

https://www.sec.gov/news/pressrelease/2015-54.html"

254.     Ms. Dhaliwal also raised a number of other concerns to Company counsel, Schwartz, in the **February 16th** Document. By way of example only, Ms. Dhaliwal stated, in pertinent part:

"Lack of representation from the Company. The Company represents it shall not use continued cooperation, as an improper method to intimidate, retaliate, threaten, cause harm or control the Employee before, during, or after providing information to, testifying or otherwise assisting in an investigation or proceeding brought by any federal or state regulatory or law enforcement agency or legislative body or any self-regulatory body."

"Not adequately addressed. FY 2015 – Inaccurate calculation of fringe mileage: (1) improperly increased the Employee's taxable wages by $7,312.50 ($403.93/mile for personal use of the Company vehicle); (2) improperly reduced the Employee's net pay by over $3,000.00; and (3) improperly increased the Employee's taxable wages in her Form W-2."

255.     The retaliatory acts against Ms. Dhaliwal worsened after the **February 16th** Document was sent to Company counsel, Schwartz.

256.     On **February 25, 2016**, the Defendants, including their counsel, Schwartz, decided to ignore Ms. Dhaliwal's comments regarding the improper language inserted throughout said Agreement with respect to the SEC, as reflected in a subsequent agreement. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

257.    Further, Company counsel, Schwartz, transmitted a second agreement to Foley on **February 25, 2016**, a Memorandum of Agreement, which, among other things, improperly characterized the payment of Foley's legal fees as consideration to Ms. Dhaliwal, when such fees arose from the internal investigation or as a result of Ms. Dhaliwal voluntarily providing information to the SEC, DOJ and other governmental agencies.

258.    In addition, the Defendant's devised other ways to punish Ms. Dhaliwal and cause her to incur further legal fees, such as: (i) having her submit expense reports through her then-counsel, Mandel; (ii) having her request pay statements through her then-counsel, Mandel; (iii) having her then-counsel, Mandel inform Company counsel, Schwartz that while she has returned to work, she is still without access to the Company's systems; (iv) having the Company's HR Director Woods inform Ms. Dhaliwal she can't help her, speak to her attorney; or (v) having Company counsel, Schwartz communicate with Ms. Dhaliwal's then-counsel regarding the payment of Foley's fees, and by so doing causing Ms. Dhaliwal to incur additional fees, among other things. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

259.    Characterizing the payment of Foley's fees as consideration to Ms. Dhaliwal in the Memorandum of Agreement – transmitted to Foley on **February 25, 2016** – potentially created an income tax liability for her in the hundreds of thousands of dollars. This conduct was an intentional and blatant act of retaliation against Ms. Dhaliwal for her having raised concerns about and having objected to the improper language and/or unlawful provisions included in said Agreement with respect to the SEC on **February 16, 2016**.

260.     In or around **March 2016**, the Defendants again barred Ms. Dhaliwal's access to its systems. Despite her then-counsel's repeated requests for access, Mallinckrodt failed to restore her access to its systems. The Defendants conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

261.     On **March 11, 2016**, upon a written request, Ms. Dhaliwal's then-counsel, Foley, in particular, David Sanders ("Sanders"), provided her a copy of a conflict waiver dated, **November 26, 2014** (the "**November 26th** Conflict Waiver") that was markedly different from a conflict waiver provided to her on **November 25, 2014**, in that the **November 26th** Conflict Waiver <u>prohibited</u> Foley from representing her in <u>any</u> capacity that was adverse to Mallinckrodt, including litigation or asserting claims against the Company.

262.     The conflict that existed throughout Foley's representation of Ms. Dhaliwal was unwaivable. Ms. Dhaliwal was squeezed between Foley, on one side, and Mallinckrodt, including its counsel, Skadden, on the other, to sign an oppressive agreement that included unlawful provisions, against her will.  This conduct was an intentional act of retaliation against Ms. Dhaliwal to silence her once and for all and further, strip her of valuable rights, remedies and protections afforded to a whistleblower.

263.     On **March 18, 2016**, Ms. Dhaliwal retained new counsel who advised Company counsel, Schwartz, of his engagement and further advised him that Ms. Dhaliwal rejected the proposed agreements transmitted to Foley on **February 25, 2015**, which included a second agreement titled, Memorandum of Agreement (collectively the "Rejected Agreements")**.**

264.    When a settlement failed to materialize Ms. Dhaliwal through her counsel demanded to be restored to her original position and further, requested access to all company systems. Defendants denied Ms. Dhaliwal's repeated requests for reinstatement and access to their systems. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

265.    As a result of the lack of access to the Company's systems, Ms. Dhaliwal had no means of obtaining her pay statements through normal channels. In or around **September 2016**, Ms. Dhaliwal used the work-around provided to her by Company counsel, Schwartz to retrieve her pay statements (when it actually worked).

266.    While reviewing the various pay statements, Ms. Dhaliwal noticed that Mallinckrodt manufactured a new pay statement that reported a pay period end, **March 20, 2016**, while the data contained therein corresponded to a different pay period altogether, in particular, pay period end **December 27, 2015** and further, back pedaled the check date to **December 24, 2015**. The Defendants manufactured numerous pay statements in Ms. Dhaliwal's name in a failed attempt to justify the amounts reported in her **2015** Form W-2 and the purported "corrected" **2015** Form W-2.  The Defendants conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

267.    The new pay statement not only removed the $7,312.50 imputed to Ms. Dhaliwal as income for Taxable Auto, but it removed other categories of taxable income effectively

reducing Ms. Dhaliwal's **2015** Year-to-Date ("YTD") taxable earnings by approximately

**$91,030.36**. For instance, without any explanation to her, Mallinckrodt also removed a rather

significant YTD itemized earnings amount of approximately, $86,039.56, along with its

corresponding description, "Res Stock Vested" from the new pay statement.

268.     In addition, Ms. Dhaliwal's **2015** YTD pre-tax deductions decreased by

approximately $8,669.10, while her **2015** YTD post-tax deductions decreased by approximately

$50,028.18 of which approximately $49,669.64 was attributed to "Stock Option Offset."

269.     In **March 2016**, Ms. Dhaliwal received a purported corrected **2015** Form W-2,

which failed to accurately correct for all these issues, among others. The Defendants conduct was

an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns

about and having objected to Defendants improper and unlawful conduct both internally and to

the SEC, DOJ and other governmental agencies.

270.     On or about **July 1, 2016**, Foley, without Ms. Dhaliwal's knowledge or consent

entered into a Memorandum of Agreement ("MOA") with Mallinckrodt (and certain other

related subsidiaries or affiliates) purporting to settle the issue of Ms. Dhaliwal's legal fees

providing for Mallinckrodt to receive any documentation requested. Said MOA purported to

resolve all outstanding fee matters and waive any further obligations of the Defendants to pay

legal fees to Ms. Dhaliwal and/or to indemnify her for same.  Such behavior is highly unethical

and reveals that Defendants through their counsel, Skadden, had complete disregard for Ms.

Dhaliwal's interests and rights and sought to undermine same.

271.     On **August 1, 2016**, despite being on notice of the issues, Mallinckrodt (by itself

and/or through UBS) for the third time oversold shares of Restricted Stock granted to Ms.

Dhaliwal to satisfy a social security wage tax liability that is due at the time the Restricted Stock shares vest, as Mallinckrodt had failed to consider that Ms. Dhaliwal had fully satisfied her social security wage tax liability for the year. The Defendants conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

272.    While said MOA was executed on or about **July 1, 2016**, it was not until several months later, specifically **October 14, 2016** that Company counsel, Schwartz, revealed the existence of said MOA and provided Ms. Dhaliwal's then-counsel a copy. The existence of said MOA was only disclosed to Ms. Dhaliwal's then-counsel after his written request on **October 11, 2016.** Said request resulted from Ms. Dhaliwal's review of certain communications between Company counsel, Schwartz and her then-counsel, which led her to suspect the existence of an agreement regarding payment of Foley's fees.

273.    Said MOA was the product of a concerted and deceitful effort to retaliate against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to the Defendants and their counsel, Skadden's unethical and unlawful conduct both internally and to the SEC.

274.    For instance, in or around, **December 2015** and **February 2016**, Company counsel, Schwartz, requested Ms. Dhaliwal to represent as Exhibit A to a proposed separation and release agreement that she provided confidential information to the SEC and other governmental agencies. As Defendants well knew she would not be able to make said representation, as she was and remains a whistleblower, a fact already known to Defendants.

90

Further, Ms. Dhaliwal's then-counsel, Foley, was aware that Company counsel, Schwartz's request in the manner it was made most certainly violated Exchange Act Rule 21F-17. Ms. Dhaliwal refused to make the representation.

275.     Following the execution of said MOA in **July 2016**, the Defendants no longer required that Ms. Dhaliwal make the aforementioned representation. Ms. Dhaliwal subsequently learned in **October 2016** that her prior counsel, Foley, without authorization had already made the representation that Ms. Dhaliwal was unwilling to make.

Said MOA states, in pertinent part:

"WHEREAS, Rasvinder Dhaliwal ("Individual") commenced employment with Questcor Pharmaceuticals Inc. ("Questcor"), which subsequently became a subsidiary of Mallinckrodt plc, on August 1, 2014;

WHEREAS, Individual retained Foley as her legal counsel… in connection with providing information to the U.S. Securities and Exchange Commission and other governmental entities (the "Indemnified Matters")"

The Defendants and their counsel, Skadden's conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

276.     On **October 21, 2016**, Ms. Dhaliwal's then-counsel sent Company counsel, Schwartz, a letter objecting to the said MOA concerning the payment of legal fees and costs and notifying Company counsel, Schwartz that Ms. Dhaliwal was completely unaware that the parties had negotiated such an agreement until it was produced after the fact. Ms. Dhaliwal's then-counsel's letter also raised concerns that the MOA as drafted would have adverse tax consequences for his client. The Defendants desire to cause Ms. Dhaliwal to incur adverse tax

consequences was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to the Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

277.    Throughout Ms. Dhaliwal's employment, the Defendants have repeatedly interfered with Ms. Dhaliwal's access to its systems. Significantly, the Defendants retaliatory acts towards Ms. Dhaliwal denied her the right to elect or waive certain employment related benefits or choose between different plan options available through Mallinckrodt, including, but not limited to medical, dental, vision and pharmacy benefits or participate in a Health Savings Account ("HAS") to which she was entitled. Further, Ms. Dhaliwal was denied the right to elect/waive or change coverage levels with respect to life, supplemental life, and other insurance benefits. Ms. Dhaliwal's **2017** benefit elections were made by persons at the Company unknown to Ms. Dhaliwal, without consulting her and were not made in her best interests. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

278.    In **January 2017**, the SEC issued Mallinckrodt a subpoena. Ms. Dhaliwal is unaware as to whether the Company has responded to the subpoena. On **January 18, 2017**, the Federal Trade Commission and certain States filed a complaint against Defendants Mallinckrodt ARD Inc., formerly known as Questcor Pharmaceuticals, Inc., a California corporation, and Mallinckrodt plc, an Irish public limited company.

279.    On **February 3, 2017**, Ms. Dhaliwal received her last payroll deposit (pay period end, February 5, 2017) from Defendants in the amount of $3,706.86, which deposit posted to her

Wells Fargo account. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

280.    On **February 7, 2017**, Mallinckrodt plc disclosed in its public filing that the Company had, in fact, received a subpoena from the SEC in **January 2017**, "[f]or documents related to the Company's public statements, filings and other disclosures regarding Acthar sales, profits, revenue, promotion and pricing."

281.    On **February 7, 2017**, Company counsel, Schwartz, sent a letter to Ms. Dhaliwal's prior counsel, which stated, in pertinent part:

> "[i]f the parties have not reached a resolution by **March 15, 2017,** the Company will terminate Ms. Dhaliwal's employment with the Company."

This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

282.    On **March 23, 2017,** Company counsel, Schwartz, sent a letter to Ms. Dhaliwal's prior counsel, which stated, in pertinent part:

> "Notwithstanding my letter of February 7, 2017, and email of February 21, 2017, to Ms. Dhaliwal's prior counsel, the Company will continue Ms. Dhaliwal's unpaid leave until further notice. Nevertheless, a representative of the Company will contact Ms. Dhaliwal to arrange for the Company to pick up the Company car."

This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

283.     Defendants have demonstrated a pattern of unremitting hostility and bad faith in its dealings with Ms. Dhaliwal. First, there was never a legitimate non-retaliatory reason to place Ms. Dhaliwal on an involuntary "unpaid" leave, just days before the **February 7, 2017** public disclosure by Mallinckrodt plc that the SEC had, in fact, issued the Company a subpoena in **January 2017** for documents relating to Acthar. The Defendants actions were retaliatory. Second, the Defendants threatened to terminate Ms. Dhaliwal on **March 15, 2017**, if she did not execute a release with the Company by such date.

284.     Rather than terminate Ms. Dhaliwal on **March 15, 2017**, the Defendants withdrew the termination threat and kept her in a state of suspended animation, which meant that the Defendants continued to isolate her from her colleagues and other employees and further punished her, by placing her on an involuntary "unpaid" lock down, while providing her certain benefits and denying her others, generating pay statements, yet, not providing her with copies, "vesting" stock, while failing to sell shares (for the fourth time) to satisfy a New York City tax withholding liability and further, stripping her of the rights and privileges afforded to other employees, among other things. This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

285.     The Defendants (and UBS) were at all times aware that Ms. Dhaliwal is a resident of New York City, as it is reflected in her address on file with the Company (and UBS). Yet, Mallinckrodt (by itself and/or through UBS) on four separate occasions; **August 2017, August 2016**, **September 2015 and August 2015**, failed to sell shares to satisfy Ms. Dhaliwal's New York City tax withholding liability that is due at the time the Restricted Stock shares vest.

286.     This situation is not remediable through the further sale of shares, as the broker, UBS, cannot sell shares retroactively to satisfy her tax liability, and, in any event, since Ms. Dhaliwal is aware of material non-public information it would be improper for her to execute a trade. This conduct – which occurred on four separate occasions; **August 2017**, **August 2016**, **September 2015** and **August 2015** – was in each instance an intentional act of retaliation by the Defendants against Ms. Dhaliwal for her having repeatedly raised concerns and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies. Notably, in the first instance, Defendants retaliatory conduct against Ms. Dhaliwal was subsequent to her **May 21, 2015** meeting with the DOJ, SEC and other governmental agencies and one day prior to her **August 4, 2015** with the DOJ, SEC and FBI.

287.     On **December 22, 2017**, Ms. Dhaliwal received a Fed-ex envelope (the "December 22nd Fed-ex Envelope") from Mallinckrodt that contained information required to complete her **2018** benefit elections. However, the information was provided to Ms. Dhaliwal in an untimely manner, too late for Ms. Dhaliwal to compare Mallinckrodt's **2018** benefits options with other plans previously available to her and to make an informed decision.

288.     For instance, the **2018** enrollment period for health plans offered through the Health Insurance Marketplace runs from **November 1, 2017 to December 15, 2017**, which timeframe had already lapsed. Further, the Defendants barred Ms. Dhaliwal's access to its systems, which among other things, disallowed her the right to use "Mallinckrodt's Human Resource Information System (HRIS), Workday, to enroll between **October 30 and November 10, 2017**" as stated in the "**2018 Mallinckrodt U.S. Annual Benefits Enrollment Questions and Answers**" document included in the **December 22nd** Fed-ex Envelope. This conduct was an

intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and having objected to Defendants improper and unlawful conduct both internally and to the SEC, DOJ and other governmental agencies.

289.    On **March 16, 2018**, Ms. Dhaliwal's counsel made a written request to Company counsel, Schwartz, for a copy of Mallinckrodt's Employee handbook. None was provided.

290.    Moreover, on **March 16, 2018**, Ms. Dhaliwal's counsel communicated to Company counsel, Schwartz that said communication constituted notice to the Plan Administrator(s) of Ms. Dhaliwal's request that her counsel be provided with all documents concerning any and all Employee Health and Welfare Benefit Plans governed by the Employee Retirement Income Security Act (ERISA) offered to Company employees, including but not limited to, the latest summary plan descriptions (SPD) (including any summaries of plan changes, not contained in the SPD), and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract or other instrument under which the plan is established or operated.

291.    It was further requested if Company counsel, Schwartz, is unable to accept notice on behalf of the Plan Administrator(s) that he promptly provide Ms. Dhaliwal's counsel with the contact information of the Plan Administrator(s) for each plan governed by ERISA. Company counsel, Schwartz, failed to reply and further, failed to provide the requested documents or information.  This conduct was an intentional act of retaliation against Ms. Dhaliwal for her having repeatedly raised concerns about and objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

96

292.     On **March 26, 2018**, Defendants terminated Ms. Dhaliwal's employment. This was the capstone to years of retaliation, harassment, threats and intimidation tactics she endured for her having repeatedly raised concerns about and objected to Defendants improper and unlawful conduct internally and subsequently, reporting what she reasonably believed to be securities law violations, including violations of Rule 21F-17 pursuant to the Securities and Exchange Act of 1934, as amended, investor fraud, violations of the FCA and AKS, among other violations of law to the SEC, DOJ and other governmental agencies.

293.     The above described actions of the Defendants were motivated solely by malice and a desire to retaliate against Ms. Dhaliwal for her internal complaints and objections and her providing information to the SEC, DOJ and other governmental agencies concerning the same and were calculated to and actually did impair, impede and interfere with Ms. Dhaliwal's right to practice her chosen profession, causing Ms. Dhaliwal to fear for her ability to earn a livelihood now and in the future.

294.     Moreover, the Defendants blatant and horrendous retaliatory acts against Ms. Dhaliwal have impacted every aspect of her life, including but not limited to her physical and emotional health.

295.     On **March 30, 2018**, Mallinckrodt made two separate deposits to Ms. Dhaliwal's Wells Fargo account in the amounts of $11,443.26 and $11,903.30, respectively. On or about **April 3, 2018**, Ms. Dhaliwal received a sham pay statement from Defendants in connection with the second deposit of $11,903.30, yet the Defendants failed to provide her any pay statement to date concerning the **March 30th** deposit of $11,443.26 that posted to her Wells Fargo account. On or about **April 7, 2018**, Ms. Dhaliwal reviewed her Wells Fargo account activity only to find

that Mallinckrodt <u>withdrew the deposit of $11,903.30 from her checking account without any</u> <u>explanation to her</u>. Further, she remains completely in the dark concerning any details regarding the deposit of $11,443.26. This conduct illustrates the Defendants' intent to continue to retaliate against Ms. Dhaliwal subsequent to her termination for her having repeatedly raised concerns about and objected to Defendants improper and unlawful conduct internally and to the SEC, DOJ and other governmental agencies.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Whistleblower Retaliation)
### (Dodd-Frank Act, 15 U.S.C. § 78u-6(h) *et seq.*)
### (Against All Defendants)

296.    Pursuant to Fed. R. Civ. P. 10(c), Ms. Dhaliwal repeats and realleges each and every allegation contained in paragraphs "1" through "295" as if repeated and incorporated herein.

297.    As a result of Ms. Dhaliwal's lawful acts in furtherance of protected activities in the reporting of fraud, and Defendants' knowledge thereof, Defendants' retaliated against Ms. Dhaliwal.

298.    On **March 6, 2015**, Ms. Dhaliwal first reported to the SEC Office of the Whistleblower what she reasonably believed to be violations of the federal securities laws, including the Defendants' unlawful retaliation against her for having repeatedly raised concerns about and objected to Defendants' improper and unlawful conduct. Further, Ms. Dhaliwal continued to provide information to the SEC in **2015**, as well as **2016** and **2017**.

299.    During a meeting on **May 21, 2015** and on **August 4, 2015**, Ms. Dhaliwal voluntarily provided information to the SEC and other governmental agencies.

98

300.     As early as **August 11, 2015** (possibly sooner), Defendants' and their counsel,

Skadden, became aware that Ms. Dhaliwal had communicated with the SEC.

301.     On **September 23, 2015**, Company counsel, Schwartz, was again made aware by

Ms. Dhaliwal's then-counsel, Mandel, that Ms. Dhaliwal had provided information to the SEC

and DOJ.

302.     On **September 23, 2015**, Ms. Dhaliwal sent an email to HR Director Woods,

which stated, in pertinent part:

> "As you know, I was abruptly placed on stand down, separated from my Payers and
> colleagues, and barred from the Company's systems after raising compliance concerns
> and continued to be in this stand down mode during such time that I was interviewed by
> the Department of Justice, the Federal Bureau of Investigation, the United States Office
> of Personnel Management, together with the Securities and Exchange Commission."

303.     On **September 25, 2105**, Ms. Dhaliwal sent an email to Sr. Director Harris and

VP Khillian, which stated, in pertinent part:

> "I very much look forward to reintegrating after 9-months or so of an abrupt involuntary
> "stand down" in which the Company separated me from my Payers and colleagues, and
> barred me from the Company's systems after I raised compliance concerns and continued
> to be in this stand down mode during such time that I was interviewed by the Department
> of Justice, the Federal Bureau of Investigation, the United States Office of Personnel
> Management, together with the Securities and Exchange Commission."

304.     On or about **July 1, 2016**, without Ms. Dhaliwal's knowledge or consent, her

prior counsel, Foley, entered into a MOA with Defendants', which further evidences Defendants'

awareness that Ms. Dhaliwal had provided "information to the U.S. Securities and Exchange

Commission and other governmental entities."

305.     As described above, Defendants' retaliated against Ms. Dhaliwal and ultimately,

terminated her for repeatedly raising concerns about and having objected to Defendants'

improper and unlawful conduct concerning securities laws violations, including violations of

Rule 21F-17 pursuant to the Securities and Exchange Act of 1934, as amended, investor fraud and Defendants' unlawful retaliatory acts against Ms. Dhaliwal for having reported her concerns to the SEC as well as internally.

306.     As a result of Defendants' unlawful acts, Ms. Dhaliwal has been damaged and is entitled to reinstatement and recovery of twice the amount of back pay otherwise owed to her, with interest; as well as compensation for litigation costs, expert witness fees, and attorneys' fees, costs and other compensation pursuant to 15 U.S.C. § 78(h)(C).

307.     Defendants' conduct set forth in this Complaint violated the Securities Exchange Act of 1934, as amended, including but not limited to, 15 U.S.C.A. §§ 78m and 78dd-1 *et. seq.* and included investor fraud.

308.     By reason of the foregoing, Defendants' have violated 15 U.S.C. § 78u-6(h)(1)(B) thereby causing Ms. Dhaliwal damages.

**SECOND CLAIM FOR RELIEF**
**(Whistleblower Retaliation)**
**(Federal False Claims Act, 31 U.S.C. § 3730(h))**
**(Against All Defendants)**

309.     Pursuant to Fed. R. Civ. P. 10(c), Ms. Dhaliwal repeats and realleges each and every allegation contained in paragraphs "1" through "308" as if repeated and incorporated herein.

310.     As a result of Ms. Dhaliwal's lawful acts in furtherance of protected activities in the reporting of fraud, and Defendants' knowledge thereof, Defendants' retaliated against Ms. Dhaliwal.

311.     In an effort to stop, correct, or otherwise remedy violations of the FCA and AKS and other violations of law, Ms. Dhaliwal repeatedly raised concerns about and objected to

Defendants' improper and unlawful conduct to not only her then immediate supervisor, Director Sweeting, but also to Director Sweeting's superiors and others in managerial positions within the Company to no avail.

312.    Despite all of Ms. Dhaliwal's efforts, the Defendants' improper and unlawful conduct continued un-remediated. On **November 21, 2014**, Ms. Dhaliwal sent an email to Mallinckrodt's CEO Trudeau and Board Member Bailey in an effort to stop, correct, or otherwise remedy violations of the FCA and AKS and other violations of law.

313.    On **November 26, 2014**, **December 23, 2014**, **January 16, 2015**, **January 22, 2015** and **January 24, 2015**, among other occasions, Ms. Dhaliwal provided information to Mallinckrodt's CCO Furey and/or Company counsel, Bentivoglio in an effort to stop, correct, or otherwise remedy violations of the FCA and AKS and other violations of law.

314.    On **January 26, 2015**, Ms. Dhaliwal again sent an email to Mallinckrodt's CEO Trudeau and Board Member Bailey, which included a slide presentation titled, "Mallinckrodt Pharmaceuticals Unethical and Potentially Illegal Business Activities." The **January 26th** email and slide presentation exemplify the efforts Ms. Dhaliwal undertook to stop, correct, or otherwise remedy violations of the FCA and AKS and other violations of law.

315.    In addition, viewing it as a matter of moral and civic duty, Ms. Dhaliwal on **May 21, 2015** and **August 4, 2015** voluntarily provided information concerning what she reasonably believed to be violations of the FCA and AKS and other violations of law to the DOJ and other governmental agencies.

316. At various times, Ms. Dhaliwal provided her then-counsel with additional materials to provide to the DOJ, however, she has reason to believe such information was never provided.

317. As set forth above in paragraphs 301-304 hereof, Defendants' and their counsel were aware that Ms. Dhaliwal provided information to the DOJ and other governmental agencies.

318. On **February 1, 2016**, Defendants' counsel, Schwartz, stated, to Ms. Dhaliwal's then-counsel, Foley, in pertinent part:

> "I would however, like to see where we stand on the other open items, assuming no issues would be left to litigate separately (e.g., legal fees or **qui tam**)" Emphasis added, bolded original.

The **February 1, 2016** email demonstrates Defendants' and their counsel, Skadden's knowledge of Ms. Dhaliwal having voluntarily provided information to the DOJ and their desire to silence her.

319. As a result of Ms. Dhaliwal's lawful acts and of the efforts she undertook to stop, correct, or otherwise remedy violations of the FCA and AKS, and Defendants' knowledge thereof, Defendants' harassed, discriminated against, threatened, and ultimately terminated Ms. Dhaliwal's employment on **March 26, 2018**, as described above. Defendants' retaliation also independently violates the federal FCA, 31 U.S.C. § 3730(h).

320. Defendants' retaliatory acts caused Ms. Dhaliwal to suffer, and continue to suffer, compensatory and special damages, including, but not limited to, past and future earnings, lost employment benefits (including, among other things, health insurance benefits and retirement

contributions) job search expenses, humiliation, mental anguish, reputational harm and emotional distress, all collectively in an amount to be determined at trial.

321.     Defendants' actions were knowing, malicious, willful, and with conscious disregard for Ms. Dhaliwal's rights under the law. Ms. Dhaliwal is further entitled to exemplary and punitive damages in an amount to be determined at trial.

322.     Defendants were aware that Ms. Dhaliwal's internal objections could easily result in an FCA enforcement action.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment against the Defendants' as follows:

(i)     Declaring that the Defendants' acts and practices complained of herein violate the Dodd-Frank Act;

(ii)     Directing Defendants' to reinstate Ms. Dhaliwal with the same seniority status that she would have had, but for the Defendants' retaliatory treatment or in lieu thereof front pay, and pay damages of two times Ms. Dhaliwal's lost back pay, with interest;

(iii)     Awarding reasonable attorneys' fees, costs and expenses pursuant to 15 U.S.C. § 78(h)(C);

(iv)     Declaring that the Defendants' acts and practices complained of herein violate the anti-retaliation provision of the FCA.

(v)     Awarding Ms. Dhaliwal all available damages, prejudgment interest, fees and costs pursuant to Ms. Dhaliwal's personal claim for retaliation under the federal False Claims Act, 31 U.S.C. § 3730(h), and Dodd-Frank Wall Street Reform and Consumer Protection Act, 15

U.S.C. § 78u-6(h) *et seq*., including without limitation, two times back pay plus interest (and prejudgment interest), reinstatement or in lieu thereof front pay, and compensation for any special damages and/or exemplary or punitive damages, financial loss of all type, and litigation costs and attorneys' fees.

      (vi)    Awarding such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated:   New York, New York
          April 10, 2018

                              Respectfully submitted,

                              **KAISER SAURBORN & MAIR, P.C.**
                              Attorneys for plaintiff

            By:      /s/ Daniel J.Kaiser
                        _____
                        Daniel J. Kaiser [DK-9387]
                        30 Broad Street, 37th Fl.
                        New York, York 10004
                        (212) 338-9100